Nikolaos BASSIS et al., Plaintiffs,

v.

UNIVERSAL LINE, S.A. and Andreas Konstantinidis, Defendants,

and

The SS CARIBIA, her Engines, Boilers, Tackle and Appurtenances, Defendant.

Fotios THEODORATOS et al., Plaintiffs,

v.

UNIVERSAL LINE, S.A. and Andreas Konstantinidis, Defendants,

and

The SS CARIBIA, her Engines, Boilers, Tackle and Appurtenances, Defendant.

Nos. 69 C 453, 69 C 587.

United States District Court, E. D. New York.

June 9, 1970.

797, 97 L.Ed. 1363; Matheny v. Porter, 10 Cir., 158 F.2d 478; McDonald v. Bowles, 9 Cir., 152 F.2d 741.

See, also, D.C., 309 F.Supp. 989.

Herbert Lebovici, New York City (Lebovici & Safir, New York City, of counsel), for plaintiffs.

James M. Estabrook, Eugene Underwood, and John S. Rogers, New York City (Haight, Gardner, Poor & Havens, New York City, of counsel), for defendant Universal Line, S.A.

Eugene Underwood, John S. Rogers, and Alexander Kritzalis, New York City (Burlingham, Underwood, Wright, White & Lord, New York City, of counsel), for Universal Line S.A. and Andreas Konstantinidis.

## MEMORANDUM and ORDER

DOOLING, District Judge.

Counsel by stipulation have taken a huge step toward putting the crew claims in shape for economical and early adjudication. They have agreed on a complex schedule of alternative average wage figures that are designed to cover every eventuality of decision on the legal issues. By this means the need for detailed trials of individual claims has been eliminated. Now, cross motions for summary judgment reach the dispositive legal issues presented on the first, third and fourth causes of action.

The claims arise out of the Caribia's misadventures. Acquired by defendant Universal, a Panamanian corporation, in July 1968, the Caribia is registered in Panama and flies that nation's flag. She was outfitted for cruise service by January 27, 1969, and in the preceding November 1968 was in Piraeus, Greece,

where apparently many of her crew of about 520 were hired. Each crew member, in any event signed one or another counterpart of a short "Seaman Agreement" which referred to the Greek Maritime Code Articles 53 and 54, was in the Greek language and referred to the "Greek Collective Agreement" as governing overtime and working conditions. The agreement was for one year, and it stated simply that the crewman "signed on" or was "engaged" at the indicated rating. The money to be paid him was set out in four parts and a total, *e. g.*:

| | |
|---|---|
| Wage | $60 |
| Sunday (11%) | 7.20 * |
| N.A.T. (16%) | 9.60 * |
| Bonus | 13.20 |
| Total | $90.00 |

*So in the agreement. The percentage addenda for Sunday and N.A.T. are, in the typical case, approximations.

The N.A.T. amount was a social welfare charge or tax levied at the rate of 8% each on employer and employee; ordinarily it was withheld and paid over by the employer. The N.A.T. form used connoted that in the Caribia hirings there would be no withholding from the crewmen nor payment by the employer. The "bonus" was the amount that, it had been decided by the shipowner and officer personnel with the hiring agent, would be offered over and above the rates provided in the Greek Collective Agreement in signing on the Caribia crew.

The Greek Collective Agreement was an agreement between certain Greek labor unions and an Association of shipowners. It provided for overtime at flat hourly rates none of which exceeded 70 cents. The Collective Agreement provided that claims arising out of employment were governed by the Collective Agreement and Greek law and were to be decided by Greek Authorities in Greek Law Courts, resort to foreign courts and law "being prohibited and expressly ruled out."

It is inferable that a great many of the crewmen were hired in Greece, but

many, if not all, of the Greek agreements were notarized in Naples, Italy on or about January 22, 1969, before the Panamanian Consul in that City in order to give them some validity under Panamanian law.

In addition, however, there were executed the forms of "Crew Roll and Agreement between Master and Seamen in the Merchant Service of the Republic of Panama" prescribed by the Labor Code of Panama Articles 135–136. While it seems that the crewmen were permitted to sign agreements, comparable to the Greek agreements, each according to his nationality, all crewmen signed the Panamanian Crew Roll and Agreement; many signed in Naples in January and the Panamanian Consul there notarized a great many of the Crew Roll entries; other crewmen signed the Roll in other ports, and Panamanian Consuls in various ports notarized the crewman entries (for example the Consul in Puerto Rico notarized on February 17, 1969, entries of crewmen who had signed on in Naples and Lisbon in late January and early February 1969). The Crew Roll and Agreement is very explicitly drawn under and invokes Panamanian law in the fullest sense.

The Crew Roll and Agreement, in Spanish and English, described the Caribia as bound from Athens to "Mar-Mediterraneo y Oceanos" and other ports and places in any part of the world as the Master might direct; the final port of discharge was left blank. The term was expressed as, For a time not exceeding "doce (12)" months.

The Caribia sailed from Naples for New York on January 27, 1969, arrived at New York on February 13, 1969, was certificated as seaworthy on that day by the Coast Guard, and sailed on her first cruise to the Caribbean on February 14, 1969. She returned on February 28, 1969, and set sail on her second Caribbean cruise on the evening of the same day. She never completed it.

On March 5, 1969, between St. Thomas and LaGuaira at 5:50 A.M. a generator room accident filled it with live steam, the main electrical switchboard short-circuited and all power was lost for fourteen hours. Temporary repairs enabled the Caribia to return to St. Thomas where she anchored on March 6, putting her passengers ashore or transferring them to other ships. Advised that permanent repairs could not be made in St. Thomas, and simultaneously deprived of her certificates by the Coast Guard, the Caribia has never since carried a passenger; her cruise passengers were returned to New York by other means. The Caribia got to Puerto Rico with tug escort, and she was there from March 10 to 21 undergoing temporary repairs that restored two of her four generators to service.

During the eleven days in Puerto Rico the crew (having no air conditioning and unsatisfactory living conditions) struck and picketed the vessel, demanding to be paid off and repatriated. The greater part of the crew was paid off and repatriated from San Juan, Puerto Rico. With the remaining crewmen the Caribia returned to New York and there most of the remainder of the crew were, on their demand, paid off and repatriated. About thirty remained aboard during layup for repairs.

The crew of the Caribia were paid monthly and signed a Wages Account at each payment date which recited their rank, total monthly wage rate, the dates of the pay-period covered and the computation of wage, overtime, deductions, etc. The Wages Account stated, in Greek and in English, just above the crewman's signature, "I received my wages up to date in full settlement including overtimes, leave allowance etc., and have no further claim whatsoever against the Vessel, her Owners, Master or any Agents thereof." During the period the Caribia was in service, and when the crew members were paid off after the breakdown, they were paid according to the Greek agreement scales for pay and overtime, signed the receipt form and signed off the Crew Roll and Agreement.

When the breakdown occurred, all members of the crew who left the ship —and nearly all left it either in Puerto Rico or in New York—were paid their wages to date, a severance sum equal to 45 times their full wage (inclusive of the Sunday allowance, N.A.T. amount and bonus) plus a food allowance, and all were repatriated or were offered and declined repatriation. There were no unresolved controversies over the payment of wages. Only two men protested, and only one of those is a plaintiff.

Plaintiffs contend that they were not and should have been paid their wages and terminal allowances under Panamanian law, using as a base for the computation of overtime and premium pay the total wage shown in the Greek agreements (and not the base wage component of that total) and adding to that base the wages in kind (Labor Code Article 183) that the men received in food and quarters on shipboard. The additional wage payments claimed include (a) overtime recomputed at the Panamanian rates of 1¼ and 1½ times straight time rates (averaged out, by stipulation effective if plaintiff's contention is legally correct, at 1⅓ times straight time rates); (b) Sunday pay computed at the Panamanian premium rate of 1½ times straight time pay for Sunday straight time work; (c) in each week in which seven days were worked, pay at the overtime rate for one additional day; and (d) vacation pay accrued to the date employment terminated (Article 1, Law No. 7 of January 26, 1950), stipulated as equal to 3.4 days, if due at all. In addition plaintiffs claim the *per diem* exaction of 46 U.S.C. § 596, and indemnifying pay for the balance of the alleged employment period on the basis that the discharge of the crew was unjustified (Labor Code, Article 78). Defendants deny each contention, insisting that the Greek agreements control, that there was no unjustified refusal or neglect to pay wages, and no unjustified dismissal of the crew entitling the men to damages for the balance of a one year's engagement.

The first question presented is whether Panamanian law governs, and particularly, the Labor and Commercial Codes. No ground appears for rejecting the law of the flag. Cunard S.S. Co. v. Mellon, 1923, 262 U.S. 100, 123, 43 S.Ct. 504, 67 L.Ed. 894; United States v. Rodgers, 1893, 150 U.S. 249, 260, 14 S. Ct. 109, 37 L.Ed. 1071. The owner was Panamanian, the registry Panamanian and every step taken in crew dealings was taken in the framework of compliance with and subjection to the Panamanian law. The Greek Agreements uncertainly invoke Greek law, but care was taken to have the Panamanian Consul notarize them, and no one has suggested obedience to the mandate of the Collective Agreement that litigation be confined to the Greek courts. The question whether the Greek agreements as contracts, can be given effect according to their terms under Panamanian law must be answered in the negative. The provisions of the Greek contracts with reference to overtime and overtime rates of pay, Sunday work and day-of-rest did not meet the standards of Panamanian law, and under the law of Panama those are provisions of law that cannot be constitutionally waived (Article 70 of the Constitution).

All except four of the plaintiffs are Greek nationals; three are nationals of Jugoslavia and one a national of the United Kingdom. The crew had included also Turks and Italians and they, on their insistence, were paid off and repatriated under their respective collective agreements rather than the Greek Collective Agreement. While, therefore, an effort was made to satisfy crewmen according to their own customs, the general law of the vessel was taken by the shipowner to be Panamanian, and the national collective agreements were used in the belief that they were lawful under Panamanian law as agreements.

While, then, much of the Greek Collective Agreement cannot be relied upon because of its invalidity under the law of Panama, the question remains whether the Greek Agreements signed

by the crewmen can be treated as validly effecting a hiring for a year at a stated wage. The Crew Roll and Agreement, in contrast to the Greek Agreements, is stated in one place to be for not more than twelve months, and is only with difficulty read as covering a year. But term and pay rate are distinct matters, and if general pay rate, rank and term are in fact agreed upon, imperfections in reducing the contract to single or plural writings would not prevent giving effect to the intention to agree on a year's hire at a stated wage. There appears to be no contradiction of the assertion that the crew were signed on for a year and that all understood that, and that part of the Greek Agreements can be considered as effective.

■ The second question is, simply, What was the seamen's wage rate? The Greek Agreements set out four components and a total for each man's pay calculation. The Crew Roll and Agreement set out the total only. The Wages Accounts (although a form using a Greek alternative in the receipt language) stated the monthly wages in the total amount only.

The 11% Sunday allowance contemplated (as under the Greek Collective Agreement) that seamen were expected to stand watch, or be available to stand watch, on Sunday. Incompatible both with the way the Caribia was worked and with Panamanian law, the Sunday allowance element is excluded (for radically different reasons) in both parties' calculations and can be put to one side.

The remaining items, "wages," N.A.T. (16%) and "bonus" are clearly additive components of a single wage rate. The components explain the evolution of the wage rate, but they have no separate significance for pay calculation purposes. Each component would become inexorably due with its fellow components; none could become separately due or could fail to be earned and become due if the others were earned and became due.

The bonus was not a bonus in the familiar American sense but was an amount in excess of the Collective Agreement scale which the shipowner agreed to pay the man regularly for his regular work.

The 16% for N.A.T. is part of the nominal "wage" rate, a factor for "grossing up" the nominal "wage" to its gross rate before withholding or paying either part of the Greek social welfare charge.

■ The next question is whether, if Panama's law applies, the value of the payment in kind (food and quarters on shipboard) is included in the wage rate in making overtime and premium pay calculations.

The opinion letters of defendants' expert do not comment on this point explicitly; the contention of the expert that base wage (the nominal wage of the Greek Agreements) is used for overtime and other calculations embraces the point in that general treatment. The Konstantinidis calculations (Memorandum in Opposition etc., pp. 35, 38 column III) seem to imply acceptance of the idea that wages in kind enter into the base wage for purposes of further calculations. Plaintiff's expert considers food and quarters includible in the wage rate because of Article 183 of the Labor Code. Article 183 defines "wages in kind" as meaning only what the worker (or his family) receive in food, lodging, clothes and other goods for immediate personal consumption, and the value in kind is to be taken for all legal purposes at half the money wage until in each specific case the value of the wages in kind is determined. Taken with Articles 179 and 181, it does appear that the wages in kind of Article 183 that are stipulated for (and not granted by the employer as gratuities) are considered an integral part of the worker's remuneration and, therefore, are wages or salary for the purpose of making pay computations. *Cf.* 29 U.S.C. § 203(m). It follows that in the case of

seamen the agreed value of the wages in kind form part of "wages" for the purpose of making pay calculations.

■ It is not altogether clear that the parties stipulated for the determination at this juncture of the question whether, in the case of a seaman working seven eight-hour days within one week he is entitled to an "alternate day off" pay award. However, a stipulation for decision is implied by Schedule A, lines 19–20, and by the parenthetical list in paragraph 1(b) of the Stipulation of April 27, 1970, and plaintiffs have argued the point.

The same point appears to have been presented and decided adversely to plaintiffs' contention by Judge Dawson in Rodriguez v. Gerontas Compania de Navegacion, S.D.N.Y.1957, 150 F.Supp. 715, 723, aff'd, 2d Cir. 1958, 256 F.2d 582; to some extent his opinion was based on deficiencies in the presentation of Panamanian law, and by a consideration of the provisions of law appearing to make the matter one of public concern rather than of private right; it is not certain beyond peradventure, indeed, that the opinion is directed to the precise facts found in this case.

As illustrated in the instance of the plaintiff Christides (subject to some details that have been controverted) the question is this: If a man is working 56 hour weeks at eight hours a day, how is his pay to be computed? Does he receive six days pay at his straight time daily rate and in addition time and a half for Sunday? Does he also treat one week day as worked overtime? (*Cf.* Labor Code, Article 153 for averaging over three-week periods where the nature of the work may require it.)

Defendants' expert argues that for Sunday work the worker is entitled to the Sunday-work surcharge of 50% but not to an implied additional day of rest; he points to Labor Code, Article 165, as authorizing agreements for Sunday work because of the seven-days-a-week nature of much maritime work. Plaintiffs' expert asserts that the monthly pay rate is for week-day work exclusive of overtime, and that, therefore, if a man both works a full day Sunday and is also given no substitute day-of-rest, then he is entitled to collect the "unpaid overtime" (*i. e.* the surcharge) and, in addition, to one day's pay at straight time rates; in his calculation (2/26/70, pp. 12–13) he illustrates by saying that the man should get one day of base pay plus one surcharge on it of 50% for Sunday and one of 25% for weekday overtime.

It is evident that the problem arises because the men were hired at a monthly rate, and the first necessity is to determine what hours of work, as a matter of intention, the monthly rate covers. The Caribia's master is clear (affid. Mar. 17, 1970); under the Greek Collective Agreement, the monthly rate covers forty hours of Monday to Friday work at eight hours a day and five hours on Saturday, plus the duty to stand watch on Sunday (compensated by the 11% surcharge); all overtime is at the flat rates and multiples of them; on any day the first four hours of overtime are at the single flat rate and the next four at double the flat rate; watch duty is evidently not considered "work" in the usual sense (on Saturday afternoon or Sunday), and, in general, the crew did not perform "work" on Sundays. The Master (*ibid.*) interpreted the Panamanian Crew Roll and Aggreement as based on eight-hour days and a forty-eight hour week, with Sunday work compensable at time and a half. Under both Agreements, the Master agrees, holidays were not work days, although the Agreements differed in the days that were treated as holidays.

It appears, then, that the monthly pay rate is for not more than six eight-hour days a week. The consequence is plain: if seven days are worked then a day of straight time must be added to start with, before considering any surcharges. If Sunday has been worked, then, even if worked as straight time, it bears a surcharge of 50%. Whether Sunday is regarded as the overtime day or one

of the weekdays is so regarded, an overtime surcharge is due the worker for the overtime hours. The Sunday and overtime surcharges are separate, and are different in kind.

The suggestion that Labor Code, Article 165, alters the case appears wrong. Article 164 requires the rest-day to be given preferably on Sunday, with the exception, provided in Article 165, that another rest-day may be substituted for Sunday if the conditions of Article 165 are met: they are conditions of necessity. But whether the Sunday work is necessary or not, it must be remunerated at time and a half. The substitution of another rest-day for Sunday neither excuses payment of the Sunday surcharge nor authorizes use of the rest-day for payless work: if the rest-day is worked, it is, logically, worked as overtime time—or the Sunday is, with an equal or greater effect on the week's aggregate of pay. That is the analysis of plaintiff's expert, and the provisions for transferred paid national holidays and for work on paid national holidays indicate that the analysis of plaintiff's expert is in keeping with the theory of the Code. Labor Code, Articles 164, par. 2, 166, par. 2, 167 ("15%" in the Fabrega translation is a misprint for "150").

The conclusion is that in every workweek in which both the Sunday and the remaining six days are worked, the seaman is entitled to the "Alternate Day Off" pay.

It is agreed that the seamen are entitled to accrued vacation pay to the date of "discharge" on the Crew Roll and Agreement under Articles 1 and 2 (first part) of Law No. 7 of 1950 (cf. Labor Code, Article 170).

 The next question is, Was the discharge of plaintiffs justified or unjustified? Plaintiffs' expert takes the view that the seamen's contracts for a year of service are valid and enforceable under the Law of Panama, and that the seamen's entitlement under Labor Code, Article 78 (if the employer terminates without justified cause), is to his pay until the date the contract would have ended; (strictly Article 78 says "shall pay compensation [indemnizacion] for damages to be determined by the respective authorities"); Article 3 of Law No. 7 of 1950 (entitling crewmen to one day's pay for each month of service if they are unjustifiably discharged and the contract is silent on the point) the plaintiffs' expert regards as limited to the case of a hiring for an indefinite time, as taking the place of Article 76 (requiring advance notice of dismissal for workers hired for an indefinite period), and as inapplicable to cases within Article 78. Rios v. Balboa International, S.A., is cited as illustrative, and it is a case in which a seaman was awarded pay for the balance period of his hire upon a finding that his dismissal was not justified. Defendants' expert contends that Article 3 of Law No. 7 of 1950 was not cited to the *Rios* Court, that an appeal taken from the judgment was not prosecuted, and that the defense point mainly relied on had been a denial of Article 59 liability on the part of the defendant successor-owner.

There was not here any indication that there could be evidence that the shipowner's action constituted an unjustified dismissal of the men, an unjustified termination of their contracts, or an unjustified discharge of the plaintiffs from the crew. Putting to one side the possibility that some large number of the plaintiffs were in breach, the plaintiffs essentially argue that the shipowner guaranteed them a year's work no matter what befell. There could certainly be such a contract of hire, and, in abstract theory, it could be said that if plaintiffs were willing and able to serve, there was no impossibility of performance on either side: plaintiffs were able to work and the shipowner, notionally, could pay to the limit of its means. But the reality is that it was impossible for anyone to do the work for which plaintiffs were hired because the ship had broken down, and the whole adventure had been frustrated. The work which the men had hired on to do

had become impossible of performance through no fault of the shipowner. The Labor and Commercial Codes visualize and regulate such situations in a variety of ways that compel the conclusion that defendants' expert is right in concluding that in the view of the Law of Panama there was no wrongful termination of the seamen's contracts, no wrongful dismissal or discharge of the men.

A labor contract may be suspended if without the employer's fault force majeure or unforeseen event necessitates suspension of work (Labor Code, Article 68(5)), and the labor contract terminates after four weeks of suspension unless the parties agree to extend it (Article 75(7)). The labor contract terminates for an unforeseen event or force majeure (Article 75(6)). Terminations under Article 75(6), (7) entail no liability to any of the parties (Article 75). Under Article 127, in the case of loss by shipwreck (*cf.* Fowles v. American Export Lines, Inc., S.D.N.Y.1969, 300 F. Supp. 1293), the labor contract terminates when the seaman has been returned (repatriated) to the port at which he signed on (Articles 125–128), and he is entitled to an economic subsidy equal to wages for two months unless custom or contract authorizes a greater one (Article 127). Under Articles 1208(5) and 1209 of the Commercial Code, if a voyage once started is cancelled by reason of any disaster befalling the ship which renders it absolutely unseaworthy, the crew have no claim except for wages due unless the disabling of the ship is the fault of the master or mate, in which case the wrongdoer must indemnify the crew for its damages. Under Article 1223(4) cancellation of the ship's voyage for lawful reasons is a ground for dismissing a seaman, and in that case the seaman is, possibly, entitled to wages up to the time of his return to the port at which he was signed on (Article 1224). In the case of wrongful dismissal, he is entitled to full voyage wages and expense of repatriation (Article 1225).

In the setting of the provisions of the Codes just cited, Article 3 of Law No. 7 of 1950 provides (Fabrega 1960 Translation):

"If the enrollment contract does not establish the pecuniary compensation due to the member of the crew in the case of unjustified discharge, or if a greater pecuniary compensation is not stipulated, then he shall be entitled, for each full month of service to a sum equivalent to the wages of a working day with a half, if the Master or an officer is dealt with and of one day, if any other member of the crew is dealt with."

Article 4 subjects Article 3 of Law No. 7 to Labor Code, Article 126, which obliges the employer to return the worker to the port designated in the Crew Roll and Agreement, or, if none is designated, then to the port at which the seaman signed on; Article 126 applies to cases of "mishap." Article 9 of Law No. 7 provides that in the case of shipwreck, the "shipping article" is terminated and the seaman is entitled only to wages to the moment of wreck and regular maintenance and transportation to port of origin as provided in Article 126; the 1950 law thus reduces the shipwreck provision of Article 127 of the Labor Code and, in part, Article 12 of Law No. 7 expressly repeals Article 127. Article 10 of Law No. 7 provides that, if the shipwreck is attributable to the Master's conduct, the seamen are in addition entitled to two months pay and the value of their lost personal effects. Law No. 7 amended (as to vessels in the international service) Article 128 of the Labor Code (which enacted that the parties could not consider any shipping contract terminated "even for just cause" if the vessel was at sea or at a port other than the port to which under Article 125 the seaman was to be repatriated), and, in part, Law No. 7 repealed Article 170 of the Labor Code (which provides generally for annual vacations for workers).

Plaintiffs' expert based his argument that Article 3 of Law No. 7 applies only

to the hirings at will described in Article 76 of the Labor Code on the coincidence of the use of the word "dismiss," applied to the worker in Articles 3 and 76; he observed that Article 78 dealt with "terminations" without just cause and did not use the term "dismiss." Defendants' expert found no basis in law or authority for the argument from word-choice. It does appear that the word "dismiss" is used of the worker and the word "terminate" is used of the labor contract, and that the distinction in usage invoked by plaintiffs' expert is not real. Indeed, Article 76, which requires a notice of dismissal proportioned to length of service, gives the worker the option of quitting at once and taking a wage amount equal to the notice period, or of "rendering service up to the *termination* of the contract" (emphasis supplied). It might be considered, too, that seamen's hirings, governed by Articles 125–136 of the Labor Code, may not be for "an indefinite period" within the meaning of Article 76 even if they have no fixed and specified termination date.

It must be concluded, therefore, that in the present case there was no unjustified discharge or termination or dismissal. The breakdown excused further performance under the law and left the parties to the resolution of the frustrated engagement under the provisions of law applicable to cases of mischance and unforeseen event.

■ There being no wrongful or unjustified dismissal, discharge, or termination, the shipowner was still not free of all obligation to the members of the crew. The obligation of Labor Code, Article 126 (to repatriate the members of the crew) clearly remained, and with it, no doubt, the obligation to pay regular maintenance, which, as Law No. 7, Article 9 implies, is part of the Article 126 obligation. Payments of amounts due under Article 126 and performance of the obligation of that Article, plus payment of accrued vacation pay, would be the only "severance pay" due to plaintiffs. No obligation to make payment under Article 3 of Law No. 7 or

under Article 78 of the Labor Code exists, since there was no "unjustified discharge" or termination "without justified cause," but a termination based on unforeseen event (Labor Code, Articles 68(5), 75(6)) ["caso fortuito" is the phrase used in both places], analogous to shipwreck (Labor Code, Article 127), and within the idea of disaster rendering the ship unseaworthy (Commercial Code, Articles 1208(5), 1209) and leading to cancellation of the pending voyage for lawful reason (Commercial Code, Articles 1223(4), 1224). No payment, however, would appear to be due under Article 1224 because the discharge of the crew was not simply "for lawful reason" but because of an unforeseen event excusing further performance.

Had the discharge or termination or dismissal been unjustified or without just cause, plaintiffs' right to severance pay would have been those provided in Article 3 of Law No. 7 of 1950 and that Article and the principles of pay computation (including accrued vacation pay) outlined above would have measured their recovery. A recovery under Article 3 would exclude any recovery of pay to the end of one year of hire (under Article 78 or otherwise). The two recoveries of Article 3 and of Article 78 are not cumulative but are mutually exclusive, and only the Article 3 recovery is available to seamen in the position of plaintiffs who have been wrongfully laid off. It is noted—further—that Article 78 does not literally require "pay" to the year-end but payment of damages as determined by the proper authority. If the crew got equal or better work upon repatriation, it may be that the damages under the Law of Panama would reflect that mitigation of damages.

It follows from what has been said that the fourth cause of action fails. Were there a claim, however, there seems to be no reason to doubt that federal admiralty would recognize the lien plainly provided by Panamanian law. It may well be that in the absence of the Panamanian law, the federal admiralty would not grant a lien; it generally de-

nies them to awards claimed for breach of executory undertakings, and seems to do so in the case even of a seaman's claim of breach of contract to hire. But 46 U.S.C. § 594 indicates that there is no hostility in policy to the recognition of a lien for damages for wrongful discharge of a seaman who has signed articles.

Defendants are entitled to summary judgment on the fourth cause of action.

█ Defendants are likewise entitled to summary judgment on the third cause of action for the *per diem* award based on refusal or neglect to make payment without sufficient cause. The crew was paid off without relevant protest. Their key demands were met, their liquidation problems were adjusted on the spot, and they were duly repatriated. Whether adherence to the Greek Collective Agreement and the expansion of the severance allowance gave them more or less than they would have received under the Panamanian articles is still not clear. (The calculations of Schedule A do not appear explicitly to reflect the extent of payments for special work made in the form of overtime pay-units but not in fact done in overtime hours.) But there is certainly no evidentiary basis for inferring that the shipowner and master were aware that the Greek agreements could not be given effect under the law of Panama; they were notarized by the Panamanian consul, and it was indicated that the Greek forms could be used. Plaintiffs' counsel, indeed, has indicated that he would not consider it appropriate to ask for the *per diems* back to the dates on which the crew members were paid off.

Whatever the power of the Courts to relieve against the rigor of Section 596 (compare Caribbean Federation Lines v. Dahl, 5th Cir. 1963, 315 F.2d 370, 374, with Swain v. Isthmian Lines, Inc., 3rd Cir. 1966, 360 F.2d 81), it is clear that the statute is addressed to conscious misconduct and not to errors of law that pass unnoticed at the time and place of payment. When the present demand was presented, it was met with denials that were made in evident good faith. There can be and there is not any suggestion that the master or shipowner practised a fraud or concealment on the crew that stifled protest or aborted the thought of protest. There is present none of the bases on which the *per diem* award has been made in the cases. See Collie v. Ferguson, 1930, 281 U.S. 52, 55–56, 50 S.Ct. 189, 74 L.Ed. 696; McCrea v. United States, 1935, 294 U.S. 23, 30–31, 55 S.Ct. 291, 79 L.Ed. 735; Conte v. Flota Mercante del Estado, 2d Cir. 1960, 277 F.2d 664, 672; Rodriguez v. Gerontas Compania de Navegacion, *supra*, 150 F.Supp. at 723.

█ The affidavit of May 5, 1970, of plaintiffs' counsel does not alter matters. It has been plain from the start that the crew claims, purely as claims and without regard to merit, were a formidable obstacle to reactivating the vessel, and that the very contour of the crew claims as presented has made them enormously difficult to cope with amicably within their terms and without reference to the many other interests that converge on the unfortunate vessel. Whatever Konstantinidis's fulminations, they throw no light on the Section 596 matter; his freedom to settle may well have passed out of his and Universal's unfettered control as a practical matter; that throws no light on the original justifiability, in the perspective of Section 596, of the acts of the master and shipowner, and does not signify to any degree that any settlement that the owner interests might now be, or might earlier have been, disposed to make would throw light on the merit of the claims or the justifiability of resisting them. The *per diems* do not become due for refusals to settle.

The second cause of action has been withdrawn and an order has been entered on it separately. The foreign attachment has been vacated by separate order.

*Accordingly it is now*

Ordered that the motion for summary judgment dismissing the third and

fourth causes of action (order to show cause of March 11, 1970, and, in part, cross motion of defendants of April 9, 1970) are granted and the cross motion of plaintiff Christides for partial summary judgment on the fourth cause of action (motion of March 16, 1970) is denied; and it is further

Ordered that the motion of plaintiff Christides for partial judgment on the first cause of action in his favor and the cross motion of defendants (in part) for summary judgment against plaintiffs Bassis, Boufis, Kalantsis and Stathis on the first cause of action are granted and denied on the issues of liability and the principles governing pay computation as hereinabove set forth; and it is further

Ordered that the motion of April 9, 1970, to vacate the *in rem* attachment is denied; and it is further

Ordered that the decision of plaintiffs' motion of March 16, 1970, for an order directing the sale of the vessel and of the defendants' motion of April 9, 1970, to fix the amount of security for release of the vessel is reserved pending further submissions in the light of the foregoing decision.