Gerassimos VINIERIS,
Plaintiff-Appellee,

v.

BYZANTINE MARITIME
CORPORATION,
Defendant-Appellant.

Cal. No. 295, Docket 83–7574.

United States Court of Appeals,
Second Circuit.

Argued Nov. 14, 1983.

Decided April 2, 1984.

Lawrence J. Mahoney, New York City (Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, of counsel), for defendant-appellant.

Edward Cherney, New York City, for plaintiff-appellee.

Before MANSFIELD, VAN GRAAFEI-LAND and HAYNSWORTH,[*] Circuit Judges.

VAN GRAAFEILAND, Circuit Judge.

This is an appeal from a money judgment which followed a jury trial before Judge Stewart in the United States District Court for the Southern District of New York. We affirm in part and reverse and remand in part.

In 1977, appellant, Byzantine Maritime Corporation, a Greek company, was the owner of a merchant vessel, the *Zenovia D*, which traded largely in the Caribbean area. On December 29, 1977, appellee, Gerassimos Vinieris, a Greek citizen, joined the vessel in Jamacia as Chief Mate. It is undisputed that appellee was not a licensed ship's officer. Appellant contends that, at the time appellee was hired, he claimed to be a licensed officer; appellee asserts that he only claimed to have had experience as an officer.

On December 30, appellee's wife joined him on board. Appellant's witnesses testified that Mrs. Vinieris was permitted aboard with the understanding that she would leave the ship at Mobile, Alabama, the first American port. Appellee denied that such an understanding existed. In any event, Mrs. Vinieris did disembark at Mobile in the midst of an acrimonious dispute between her husband and the ship's Captain. The *Zenovia D* then continued on to Houston, Texas. Appellee did no work on this leg of the journey. He contends that he was confined to his cabin and not permitted to work. The Captain testified that appellee was not confined and that he simply refused to work. Whatever the nature of the parties' differences, appellee was removed from the ship upon its arrival in Houston on February 18, 1978, put on a plane and returned to Greece.

On April 9, 1979, appellee brought this suit. As one cause of action, he alleged that the incidents connected with his removal from the ship constituted false imprisonment. This claim was submitted to the jury, which awarded appellee $1,000 in damages. Since the false arrest claim was a clear-cut factual issue and was presented fairly to the jury, this portion of the verdict will not be disturbed.

However, the propriety of the false imprisonment award is not the real issue on this appeal. When appellee was discharged in Houston, he met with the ship's Captain and the Port Captain to secure his discharge pay. Both Captains testified that, at that time, appellee was paid $1,082, his net wages for the period between December 29, 1978 and January 31, 1979, and $770 for the period between January 31, 1979 and February 13, 1979, which was the last day on which appellee did any work. Although receipts for both payments were initialed by appellee, he testified that he actually received no part of the $1,082 and only $670 of the $770. It is undisputed that appellee was not paid for the five days during which the ship was en route from Mobile to Houston, during which he did no work.

In his opening to the jury, appellee's counsel, after stating his contentions concerning payments, said:

> We are claiming, of course, the amount of wages that Mr. Vinieris earned and was not paid. We are also asking for a finding, *just a finding, not an amount of money,* that the owners of this ship, the Zenovia D, deliberately withheld this money from him unreasonably, without any reasonable belief that they had the right to withhold any part of that money. (Emphasis supplied)

In his summation to the jury, appellee's counsel continued in the same vein. He said that, whether or not Vinieris was a

[*] Of the United States Court of Appeals for the Fourth Circuit, sitting by designation.

licensed officer, he "was entitled to be paid for the work that he did, and that's really what this case is about." Referring to a voucher which gave the date of appellee's discharge as February 13, 1979, counsel said:

> That's not the date he was discharged. If he had been discharged in Mobile, well, we wouldn't have a claim for those five days. But he wasn't. That explains why that voucher, this handwritten voucher, says February 13, so that they could save five days' pay.
>
> If it was $34 or $35 a day, it was a lot. But they did it so that they could save that pay.

He then concluded:

> Of course, we are asking for all the wages that were due and were not paid. That includes five days earned wages and that includes the entire amount on the first voucher and approximately $100 on the second.
>
> We are also asking for one thing further, *and that is a finding which wouldn't have any dollar amount attached to it* that this was done—this withholding of wages, is what I am talking about, both as to the five days and as to the vouchers, that that was done in such a manner as to amount to arbitrariness, unreasonableness, that it was done without substantial cause. (Emphasis supplied)

In actuality, Vinieris was claiming much, much more than the wages he had earned and not been paid. He was suing under a statute, 46 U.S.C. § 596, which the district judge described as "horrible" and "very unfair", and other judges have termed "harsh", *Mavromatis v. United Greek Shipowners Corp.*, 179 F.2d 310, 318 (1st Cir.1950), "rigor[ous]", *Bassis v. Universal Line, S.A.*, 322 F.Supp. 449, 459 (E.D.N.Y.), *aff'd*, 436 F.2d 64 (2d Cir.1970), and "punitive", *Dendrinos v. City of New York*, 86 F.Supp. 688, 690 (S.D.N.Y.1949), and which may produce results that are "both absurd and palpably unjust", *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 586, 102 S.Ct. 3245, 3258, 73 L.Ed.2d 973 (1982) (Ste-

vens, J., dissenting). That statute provides in substance that, if wages are withheld without sufficient cause, the shipowner must pay "a sum equal to two days pay for each and every day during which payment is delayed." This harsh penalty, not appellee's modest claim for lost wages, is "really what this case is about." Appellee's total claim for unpaid wages was $1,361.08. The penalty for which appellee was suing was $2,000 per month, twice appellee's monthly salary, the penalty starting on February 22, 1978 and continuing ad infinitum until paid. As this opinion is being written, the amount of the penalty is approximately $144,000, over 100 times the lost wages which the jury was informed was the gravamen of appellee's claim.

Because of the patent unfairness of a penalty which can be so grossly disproportionate to the event that triggered it, a number of courts attempted to ameliorate the penalty's effect by reading equitable time limitations into the statute. *See, e.g., Forster v. Oro Navigation Co.*, 128 F.Supp. 113, 116–17 (S.D.N.Y.1954), *aff'd*, 228 F.2d 319 (2d Cir.1955). However, in *Swain v. Isthmian Lines, Inc.*, 360 F.2d 81 (3d Cir.1966), the Court held that those who followed this practice were placing their emphasis in the wrong place and that they should concern themselves instead with the factors surrounding the motivation of the shipowner in making a wage deduction. *Id.* at 87. Because the Supreme Court has adopted this literal interpretation of the statute's penalty provisions, *Griffin v. Oceanic Lines, supra*, 458 U.S. 564, 102 S.Ct. 3245, the sole concern of the courts must be whether and for what reason wages were withheld.

With regard to these issues, the decision in *Griffin* did not change in any way the well-established rule that "wrongful withholding alone does not establish the absence of sufficient cause" under section 596. *Larkins v. Hudson Waterways Corp.*, 640 F.2d 997, 999 (9th Cir.1981). The punitive penalty of section 596 should not be imposed where payment is withheld in good faith under a reasonable belief that

it is not due, *Bender v. Waterman S.S. Corp.*, 166 F.2d 428 (3d Cir.1948), *The Velma L. Hamlin*, 40 F.2d 852, 854 (4th Cir. 1930); where there is a bona fide dispute as to the amount owed, *Conte v. Flota Mercante Del Estado*, 277 F.2d 664, 672 (2d Cir.1960), *Usatorre v. The Victoria*, 172 F.2d 434, 444 (2d Cir.1949), *Glandzis v. Callinicos*, 140 F.2d 111, 114–15 (2d Cir. 1944); or where there has been an honest error of judgment in this regard, *The Thomas Tracy*, 24 F.2d 372, 374 (2d Cir.), *cert. denied*, 277 U.S. 595, 48 S.Ct. 530, 72 L.Ed. 1005 (1928). Before Vinieris could recover under this section, therefore, there had to be a showing of "conscious misconduct" on the part of the ship's Captain, *Bassis v. Universal Line, supra*, 322 F.Supp. at 459, conduct by the Captain which was arbitrary, unwarranted, unreasonable, unjust, and willful, *Collie v. Fergusson*, 281 U.S. 52, 55, 50 S.Ct. 189–191, 74 L.Ed. 696 (1930); *Glandzis v. Callinicos, supra*, 140 F.2d at 115.

Because these are the crucial issues in the instant case, the trial court should have followed a liberal policy in admitting evidence directed towards establishing the Captain's subjective state of mind. No evidence which bore even remotely on this issue should have been kept from the jury, unless it interjected tangential and confusing elements which clearly outweighed its relevancy. *United States v. Brandt*, 196 F.2d 653, 657 (2d Cir.1952); *United States v. Foshee*, 578 F.2d 629, 632–33 (5th Cir.1978); *Coleman v. United States*, 167 F.2d 837, 840 (5th Cir.1948). Of course, testimony by the Captain as to his beliefs, motives, and intent was material and admissible. *United States v. Kyle*, 257 F.2d 559, 563 (2d Cir.1958), *cert. denied*, 358 U.S. 927, 79 S.Ct. 312, 3 L.Ed.2d 301 (1959); *United States v. Hayes*, 477 F.2d 868, 873 (10th Cir.1973).

The district court erred, therefore, in precluding the Captain from testifying that he was under very strict orders from his superiors to pay earned wages because of the very severe penalties involved and that the Captain, himself, had a personal awareness of the possible consequences of his failure to pay. Permitting the Captain to testify only that it was important that wages be paid, without permitting him to explain to whom it was important and why, did not disclose the Captain's state of mind. Indeed, an unjustified inference of pettiness and bad faith on the part of the Captain may have been created simply because of his failure to perform this "important" duty.[1]

The district judge's rejection of the proffered testimony might not have been so prejudicial if the judge had informed the jury in his charge of the substantial penalty for which Vinieris was suing. Had the judge done so, the jurors might have assumed that the Captain was aware of the substantial loss that his employer might incur if the Captain arbitrarily and capriciously withheld even a modest amount of salary and had governed his conduct accordingly.

Instead of telling the jurors "really what this case is about", the district judge simply instructed them that plaintiff was claiming that defendant failed without sufficient cause to pay wages that were due him. The judge told the jury that "without sufficient cause" meant a willful, unreasonable, and arbitrary refusal to pay, and defined those words in general terms. His entire charge on the important issue of sufficient cause was given in seven sentences.

After instructing the jurors that it was they "who have to decide whether the defendant is liable and plaintiff suffered damages", the court submitted the entire case to them by way of special interrogatories, as it was permitted to do under Federal Rule of Civil Procedure 49(a). However, the court refused appellant's repeated requests that the jury be informed of the penalty which was plaintiff's major claim.

---

**1.** Because of the dissent's differing view of the record, we discuss the record in greater detail in the Appendix.

Relying on what he believed to be a rule of nondisclosure in antitrust cases, the district judge refused to remove the blindfold which he had placed on the jury.

The district court was mistaken concerning this Court's position on disclosure in antitrust cases. In *Bordonaro Bros. Theatres, Inc. v. Paramount Pictures, Inc.*, 203 F.2d 676, 678 (2d Cir.1953), the complaint pleaded the appropriate sections of the Sherman and Clayton Antitrust Acts and specifically claimed the treble damages provided by statute. Writing for the Court, Judge Clark said:

> Surely reference either to the pleadings or to the governing statute is so usual a course in jury trials as to occasion no comment. Hence the recital in the trial judge's charge of just what had happened in the former action and what was claimed in this suit was quite appropriate.

Moreover, the theory espoused by some, that juries should not be informed of the legal effect of their answers in Rule 49(a) cases, has been the subject of both judicial and scholarly criticism. *See, e.g., Lowery v. Clouse*, 348 F.2d 252, 261 (8th Cir.1965); *Porche v. Gulf Mississippi Marine Corp.*, 390 F.Supp. 624, 632 (E.D.La.1975); Green, *Blindfolding the Jury*, 33 Tex.L.Rev. 273, 280–84 (1955). Indeed, at least one early advocate of the nondisclosure rule has acknowledged that, upon further study and reflection, he finds the contrary position preferable. *See* 9 Wright & Miller, *Federal Practice and Procedure*, § 2509, at 513 n. 8.

Even those who advocate nondisclosure could hardly quarrel with the proposition that, when a party's intention is at issue, the jury should make its determination only after considering all the circumstances connected with the act charged. *See United States v. Lichota*, 351 F.2d 81, 89–90 (6th Cir.1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966). Moreover, even the most ardent advocate of noninformation would be unlikely to support a policy of misinformation. While we do not suggest here that appellee's counsel deliberately misled the jury concerning what the case was about and in stating that he was seeking "just a finding" of insufficient cause, "not an amount of money", he sailed rather close to the wind in making the statements quoted above. *See Conway v. Chemical Leaman Tank Lines, Inc.*, 525 F.2d 927, 930 (5th Cir.1976).

Motivation and intent were not, of course, the only issues which called for a fair determination knowledgeably made. Equally important was the issue of credibility. The district judge denied appellant's motion for a new trial despite the fact that he "did not believe the plaintiff" and would have reached a different result. Had the jurors known, as did the judge, how large a financial stake plaintiff had in the outcome of the case, their reaction might have been the same as that of the judge. A jury should not be asked to weigh credibility with only half the facts on the scale.

█ In close cases, where affirmance is inconsistent with substantial justice, trial errors should not be disregarded lightly. *Bickerstaff v. South Cent. Bell Tel. Co.*, 676 F.2d 163, 169 (5th Cir.1982); *United States v. Kahaner*, 317 F.2d 459, 485 (2d Cir.), *cert. denied*, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963); *E.I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1257 (8th Cir.1980). Because we conclude that the errors above discussed cannot be treated as harmless in this case, we reverse the award for loss of wages and the section 596 penalty and remand for a new trial on these issues. The award for wrongful imprisonment is affirmed.

## APPENDIX

On page 6 of appellant's brief, its counsel said:

> With respect to the payment of earned wages, Captain Gerolimatos and Captain Balactaris were both prepared to testify that it was a strict policy of the ship operator that all earned wages be paid at the time of a seaman's discharge. Captain Gerolimatos would have testified that he and other Masters received strict

orders to pay earned wages, particularly where seamen were paid off in American ports because of the severe penalties imposed by American law for failure to pay earned wages.

However, the trial Judge excluded this tesimony [sic], in accordance with his previous ruling that the jury should not be informed that this was a penalty wage claim, or that the defendant would be required to pay approximately $125,000 if the jury found that it wrongfully withheld the plaintiff's earned wages. (A275, 304)

The record clearly supports this statement and makes clear the basis of our holding. During a robing room conference, the following colloquy took place:

MR. MAHONEY: Your Honor, what I want to discuss a little further, there is another aspect of this penalty wage problem that arose that I hadn't thought of until I was talking to Captain Gerolymatos.

THE COURT: I was going to suggest that we go ahead with the Captain now and talk about this when we take the break to pick up his papers, but that means he wouldn't be here.

MR. MAHONEY: I was impressing on him the concern about the earned wages, and he said "We have always orders, very strict orders, above all, what we must do, we must pay earned wages." He said, "We have orders always from the owner that this is very important, that there are very severe penalties." He knew that it was a very serious matter.

We are dealing here, I think unusually so, with a severe credibility question. We have black or white. It seems to me it goes to the very heart of the credibility to demonstrate to the jury that the defendant would be most unlikely to withhold earned wages being aware of the severe ramifications, the severe results of failing to do that.

It would seem to me that we are dealing with such a close question of credibility, if the jury thinks we are dealing with

$1000, or whatever it is, the withholding would seem to be more of a possibility.

To me it is incredible that—

THE COURT: All you are saying, really, it seems to me, Mr. Mahoney, is that the statute is very unfair, and I don't disagree with that for a moment. It seems to me that an appropriate cutoff date, at least, would be the date the complaint is filed claiming lost wages; but that isn't the statute, darn it, there it is.

MR. MAHONEY: I understand that, but it seems to me we get into the areas of credibility here where a recognition on the part of the defendant—

THE COURT: The only area we get into, really, ultimately, is, assuming the jury believes one person and not the other, then you are stuck with the law.

MR. MAHONEY: It occurs to me that I would find, if I were objective, which I am not, that I would find it incredible that a company or a master, being aware of the results of withholding earned wages, would do so out of animosity or whatever is attributed to him.

THE COURT: That's something the jury has to evaluate.

Incidentially [sic], your proposed charge didn't help me very much. That is something we are going to have to talk about, what we say in the charge about unreasonable cause, or whatever the phrase is.

MR. CHERNEY: Without substantial cause, I believe is the exact statutory language, but I will concede that there are district and circuit court cases which interpret that and I will concede—I have to reread the Griffin case. I don't believe that the Griffin case changed that standard, although that is subject to re-review.

What the Griffin case says, though, is that once there is a finding supported evidentiarily [sic] of a withholding without a substantial cause, that there is no discretion in the district court.

THE COURT: Mr. Mahoney doesn't disagree with you about what the Griffin case says or what the statute says. All

he is arguing is that the jury ought to know what the penalty is because it bears on the question of credibility as to whether or not the company would have done what they did, faced with the potential consequences.

MR. CHERNEY: I can't buy that, your Honor, because—

THE COURT: I just indicated I don't buy it either, so you don't need to argue the point. I buy the fact that this is a horrible statute. You do something in very good faith and you can get stuck with a heck of a lot of money.

Thereafter, at the crucial point in Captain Gerylomatos's testimony, the record reads as follows:

Q. Did you have any orders in general from the company, from your employer, about paying any seaman earned wages?

MR. CHERNEY: I object. I think this has already been asked and answered.

THE COURT: I will allow the question. I think before we go any further we ought to take our mid-morning recess.

Ladies and gentlemen, I should have told you earlier this morning, we are planning—I may have told you this yesterday, I am not sure, but in any event, we are planning to work today until about one o'clock and we will adjourn at that time for the day.

We will take our mid-morning recess right now.

(Jury not present)

THE COURT: I'd like to hear the answer to that question.

(Record read)

THE WITNESS: We have been instructed from the owners to pay in full any wages earned to the seamen and to be very careful on this fact in order to don't have any future problems with the crew members.

But it is not necessary even to be instructed from the owners. Me or any captain, we have to do the legal procedure. Otherwise we will be responsible before the Immigration and the law or be punished, too, if we don't do properly this.

MR. CHERNEY: Your Honor, I will concede that the first sentence of the answer is okay, but I don't think the rest of it is.

(Record read)

THE COURT: The last sentence beginning—I don't know where it began, but the last sentence, it seems to me, from what the captain said, I took it it was not instructions from the owners, but something that he was just generally aware of, is the way he put it.

I think the first sentence was fine, as Mr. Cherney does.

MR. CHERNEY: I don't think it is fine, but I think it is admissible.

THE COURT: That's all I meant.

MR. MAHONEY: Beyond that, your Honor, I think that the witness—

THE COURT: I don't think the rest of it I will receive.

MR. MAHONEY: I could see perhaps it not being responsive to the question about instructions from the owner.

THE COURT: Even if it were responsive, I wouldn't allow it.

MR. MAHONEY: Suppose I were to address to him a question about his own awareness of the importance.

Would that not be relevant?

MR. CHERNEY: No.

THE COURT: It is a difficult problem. That's really what he was saying in the last sentence, the one we are considering, his own awareness of the problem.

MR. MAHONEY: I agree that the latter part is not responsive, but it would seem to me that perhaps even more relevant is his own awareness, his own state of mind at that time, of the importance of—

THE COURT: I don't have any problem with the Captain saying that it is very important, but I don't like the word punishment or the law.

I think you could instruct the witness to that.

MR. MAHONEY: I will, of course, do that, but I would like to respectfully

except on the record, that I think his awareness of possible consequences is very relevant to the credibility questions.

MR. CHERNEY: I don't think it is—

THE COURT: I don't believe counsel is arguing that question.

MR. MAHONEY: I am just preserving the record.

When the jury returns, shall we have the reporter—I don't want him to misunderstand.

THE COURT: I would think—

MR. CHERNEY: Can we have the reporter read the first sentence of the answer as the witness' answer?

MR. MAHONEY: I will try to rephrase it and make the Captain understand.

MR. CHERNEY: And cut him off at the right point. Say "Thank you, you have answered the question."

(Recess)

(In the robing room)

THE COURT: It seems to me that if, for example, I don't know whether this happened, but if I were a shipowner, I would be sending out at least twice a month to my captains, "Look, make sure these people get paid, because if we don't pay them we are going to get hooked with enormous damages because of the statute which reads as follows, and I want you to know about the Griffin case where there was $300,000 of liability for a $6000 claim."

Why shouldn't a man be entitled to testify to that, if that's the fact? Maybe I am being more cautious than I should, but it seems to me that I will permit the witness to say, if we are satisfied, that this is something that he was aware of on February 18, 1978 and didn't become aware of obviously because his lawyer instructed him about it thereafter or didn't become aware of it because he learned about it by reading of it in the newspapers or thereafter, but if at the time he was consciously aware of the fact that it was important to pay these people because the law provided and required that they are paid, okay, I will take that much.

MR. CHERNEY: I except to that.

THE COURT: Then I don't think you can go on and say something about punishment. That's the same conclusion I reached before.

MR. MAHONEY: I already told him that.

We suggest that the only fair reading of the record shows that the appellant was not permitted to disclose that Captain Gerylomatos had been warned by the company of the enormous damages that might be imposed if he withheld payment of appellee's wages without substantial cause. Moreover, the efforts of appellant's counsel and Captain Gerylomatos to frame the Captain's answer so as to abide by the district court's ruling does not warrant a contention that the Captain could not have testified about the penalty had he been permitted to do so.

MANSFIELD, Circuit Judge (dissenting).

I respectfully dissent. In my view the majority erroneously assumes that the district court barred a key defense witness (Gerylomatos) from testifying that he was aware, when he discharged and paid off appellant, of the penalties imposed by the statute for failure to pay all earned wages due. As I read it the record does not support this assumption and indeed appellant has not advanced on this appeal the argument that it was error to preclude him from eliciting such testimony at trial.

The majority also establishes a new rule of law which in my view is ill-advised: that it is reversible error for a district judge to fail to advise a jury of the penal consequences imposed by 46 U.S.C. § 596, an admittedly harsh statute [1] for failure to

---

**1.** Unquestionably the penalty imposed by the statute can be Draconian, as the Supreme Court recognized in *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), where it upheld a double-wages penalty of $302,790.40 for a vessel operator's wrongful refusal to pay a seaman $412.50 in wages due him. However, when Congress mandates such a heavy penalty as a deterrent we are not at liberty to devise methods of circumventing its

pay without substantial cause wages due. In my view this rule contradicts the purpose of the statute and might unfairly prejudice and deter a jury from making a finding supported by the preponderance of the evidence that wages have been unjustifiably withheld. The proper remedy for the statute's harsh effects lies not in allowing the jury to be prejudiced in the performance of its traditional fact-finding duty but in a Congressional enactment.

The majority first holds that the district court erred

> "in precluding the Captain from testifying that he was under very strict orders from his superiors to pay earned wages because of the very severe penalties involved and that the Captain, himself, had a personal awareness of the possible consequences of his failure to pay." (Maj.Op. p. 1064).

Appellant, however, has not claimed any such preclusion; indeed it argues solely that the jury's verdict was against the weight of the evidence and that the trial judge should have set the verdict aside.

Appellant's failure to claim that there was any erroneous evidentiary ruling with respect to the testimony of Captain Gerylomatos is not surprising. The record is clear that Gerylomatos was not prepared to testify that he was aware of the penalty provisions of 46 U.S.C. § 596, either specifically or generally, at the time when he discharged Vinieris. At one point appellant's counsel argued, in colloquy with the court out of the jury's presence, that Captain Gerylomatos should be allowed to testify that he had orders from the owner that the matter (paying earned wages on discharge) was "very important, that there are very severe penalties" (A. 272–73). However, the same counsel eventually conceded at the side bar that "the captain doesn't know anything about the statute," [2] and directed his efforts toward seeking to persuade Judge Stewart to instruct the jury regarding § 596, which the court refused to do. When the Captain was eventually permitted to state out of the jury's presence whether he had "any orders in general from the company, from your employer, about paying any seaman earned wages," he testified:

> "THE WITNESS: We have been instructed from the owners to pay in full any wages earned to the seamen and to be very careful on this fact in order to don't have any future problems with the crew members.
>
> But it is not necessary event to be instructed from the owners. Me or any captain, we have to do the legal procedure. Otherwise we will be responsible before the Immigration and the law or be punished, too, if we don't do properly this."

intent, which was "to strengthen the deterrent effect of the statute by removing the court's latitude in assessing the wage penalty." *Id.* at 574, 102 S.Ct. at 3252. In *Griffin* the Supreme Court applied the plain language of the statute to preclude any judicial limitation on the penalty period.

**2.** The majority has overlooked this portion of the trial record, which reads as follows:

> "Q Did Captain Bairaktaris, Captain Mike, speak to you about signing Vinieris off?
>
> A Yes, he told me—
>
> MR. CHERNEY [Counsel for plaintiff]: Excuse me, I would like a conference, if your Honor please, a side bar conference, now.
>
> (At the side bar)
>
> MR. CHERNEY: This may relate to what we were discussing inside before. If Mr. Mahoney [counsel for defendant] intends to elicit from this witness testimony to the effect—be

very careful with wages because of very dire consequences and all that effect, I would be very severely prejudiced.

> THE COURT: *I thought you told me that the captain doesn't know anything about the statute.*
>
> MR. MAHONEY: He doesn't.
>
> THE COURT: *So you are not going to go into that, are you?*
>
> MR. MAHONEY: *His statement to me was that he received orders, not only in this case but generally, that it is very important to pay earned wages.*
>
> THE COURT: *That's all right.*
>
> MR. MAHONEY: I don't see anything wrong with that.
>
> MR. CHERNEY: Very important to pay earned wages and stop right there, fine. I still note my objection for the record." (Emphasis supplied).

Judge Stewart thereupon made clear that if Gerylomatos could testify that on February 18, 1978, the date when he discharged Vinieris, Gerylomatos was aware of the penalty statute he could so testify but that he could not so testify if he learned of it later from his lawyer or from reading it in the newspapers. The court further ruled that in any event Gerylomatos would be permitted to testify that he knew it was important to pay a discharged seaman his earned wages because the law provided and required that they be paid. Said the court:

"THE COURT: It seems to me that if, for example, I don't know whether this happened, but if I were a shipowner, I would be sending out at least twice a month to my captains, 'Look, make sure these people get paid, because if we don't pay them we are going to get hooked with enormous damages because of the statute which reads as follows, and I want you to know about the Griffin case where there was $300,000 of liability for a $6000 claim.'

Why shouldn't a man be entitled to testify to that, if that's the fact? Maybe I am being more cautious than I should, but it seems to me that I will permit the witness to say, if we are satisfied, that this is something that he was aware of on February 18, 1978 and didn't become aware of obviously because his lawyer instructed him about it thereafter or didn't become aware of it because he learned about it by reading of it in the

newspapers or thereafter, but if at the time he was consciously aware of the fact that it was important to pay these people because the law provided and required that they are paid, okay, I will take that much."

Applying this principle, Judge Stewart properly ruled that Gerylomatos could testify to the first part of the answer he had given out of the jury's presence but not the latter half. The latter half of the answer was not relevant to the issue before the court, which was whether Gerylomatos was aware of the substance of § 596 on February 18, 1978, the date when he discharged Vinieris. The second half of the answer does not refer to § 596 but to "Immigration" and to an unidentified "law" under which he would be "responsible." Appellant's counsel sought to explain this answer by volunteering that the witness "has a vague idea" and might be "talking about Greek law." [3] Gerylomatos, moreover, made clear that he was unaware of the statute when he then testified before the jury only that his orders from his superiors were "to pay the seamen in full their earned wages."

Thus there is no basis in the record for the majority's erroneous assumption that Captain Gerylomatos was precluded from testifying that he was aware of the substance of 46 U.S.C. § 596 when he discharged Vinieris. [4]

The majority next holds that the district court erred in not advising the jury of the

---

**3.** Here again the majority overlooks a pertinent portion of the court's colloquy with appellant's counsel:

MR. CHERNEY: He knew it had to be paid because the law requires it to be paid, that is almost redundant. It is the law of every civilized country that people who work should be paid.

THE COURT: The thing we are going to be adding here is that there is a law that requires this and that therefore it is important that he was instructed that wages be paid.

That is about what he is going to say, I take it.

MR. MAHONEY: Yes. *He told me, 'You know we were always told, not only by this company, that you have got to pay earned wages.' He has a vague idea. He doesn't know any-*

*thing about—I think he is talking about Greek law. He said, 'We were told it is very important. I know it is important.'*

THE COURT: *He can say that."* (Emphasis supplied).

**4.** There is no suggestion that Captain Balaktiaris would have testified that he was aware of the substance of § 596 when he participated in the discharge of Vinieris. Appellant's counsel never sought to elicit any testimony from Balaktiaris on the subject, nor even that Balaktiaris would confirm Vinieris' testimony that his employer had ordered them to pay in full all wages earned by a seaman at the time of discharge. Nor did Balaktiaris volunteer any such information.

penal consequences imposed by § 596 for failure without substantial cause to pay wages due. Judge Van Graafeiland first suggests that such disclosure was essential in this case to counteract the impression left with the jury by plaintiff's counsel in his summation that the issue before it was only a few days' pay when in fact the jury's verdict could lead to a judgment of a much larger sum after imposition of the penalty provisions by the court. Unquestionably the district court was placed in a dilemma by the penalty statute. If the penalty provisions were not disclosed to the jury there was the possibility that the jury, acting in the mistaken belief that only a small sum was involved, might have been tempted to decide that wages were unjustifiably withheld. If, on the other hand, the court disclosed to the jury the sizeable penalty that would be imposed in the event of a verdict in the plaintiff's favor, the jury might be deterred unfairly from rendering such a verdict. We have not found any authority to the effect that the jury must be advised of the possible penal consequences under § 596 that might be imposed if the jury finds that wages were wrongfully withheld. Faced with the identical issue in a civil antitrust suit for treble damages under the Clayton Act, 15 U.S.C. § 15, the Fifth Circuit in *Pollock & Riley Inc. v. Pearl Brewing Company*, 498 F.2d 1240, 1242–43 (5th Cir.1974), held that it was error for the trial judge to inform the jury of the mandatory damage-tripling provision of the statute, stating:

> "The primary policy supporting our decision is that underpinning the tripling provision itself. The purpose of treble damages is to deter violations and encourage private enforcement of the antitrust laws. The justifiable fear of antitrust plaintiffs is that the juries will adjust the damage award downward or find no liability, therefore thwarting Congress's purpose, because of some notions of a windfall to the plaintiff. One court has even suggested that a jury might take the revelation of the treble damage provision as an intimation from the court to restrict the amount of damages. In sum, we agree with the Court of Appeals for the Tenth Circuit that informing a jury would serve no useful function and its probable consequence would be harmful—an impermissible lowering of the amount of damages.
>
> "Second, it is not for the jury to determine the amount of a *judgment.* Its function is to compute the amount of *damages.* Congress's authorization in 15 U.S.C.A. § 15 to triple the award of damages is a matter of law to be applied by the district court without interference from the jury. The fact that the awarded amount will be tripled has no relevance in determining the amount a plaintiff was injured by the anti-trust violation." (Footnotes omitted; emphasis in the original.)

In my view these principles apply to the present case. To hold that a jury must be advised of the penal consequences of a verdict for the plaintiff denigrates the jury's intelligence, conscientiousness, and integrity. It is not the jury's function to decide the penalty issue. If Congress had desired such an instruction it could have provided for it in the statute, which it did not. Nothing precludes the trial judge from emphasizing the importance of the wage-withholding issue to the jury or from even indicating generally that its verdict may have consequences going beyond the modest amount of wages at issue. But if the judge properly instructs the jury regarding the governing principles of law (as was done in this case) his failure to indicate the possibility of other consequences should not be treated as reversible error.

We have no reason to believe in the present case that the jury did not carefully follow and apply Judge Stewart's instructions. The issue was essentially one of credibility. If the jury believed the testimony of the plaintiff and other witnesses offered by him, as appears to have been the case, the jury's answers to the interrogatories were supported by substantial evidence and should therefore be upheld. It is true that upon disposing of appellant's motion for a new trial Judge Stewart stat-

ed that he would have reached a different result since he "did not believe the plaintiff" and "found the defendant's witnesses credible." Appellant bases its appeal almost entirely upon this statement, arguing that it placed the trial judge under a duty to grant a new trial. Yet appellant overlooks the balance of Judge Stewart's remarks: "I think the ... jury's verdict was justified based on their view of the credibility of the witnesses. They could have believed the plaintiff, as they obviously did." See, e.g., Bevevino v. Saydjari, 574 F.2d 676, 685 (2d Cir.1978) ("the district court was not required to grant a new trial simply because he disagreed with the jury"); Compton v. Luckenbach Overseas Corp., 425 F.2d 1130, 1132 (2d Cir.), cert. denied, 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155 (1970) (even though the district court "found defendant's evidence 'overwhelming' " he was not required to set the verdict aside); 6A Moore's Federal Practice ¶ 59.-08[5] (1983) (the trial judge should "abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result"). In short, the trial judge merely stated how he would have voted as a juror but recognized that his function as a judge precluded his setting aside the jury's verdict. Compton v. Luckenbach Overseas Corp., 425 F.2d at 1132–33.

None of the authorities cited by the majority support the view that a trial judge has a duty to instruct the jury concerning the penalty provisions of § 596 and that his failure to do so is reversible error. Bordonaro Bros. Theatres Inc. v. Paramount Pictures, Inc., 203 F.2d 676 (2d Cir.1953), relied on by the majority, merely held that a trial judge's mention of treble damages in a civil antitrust suit is not reversible error since the damages were pleaded in the complaint. It did not hold that it is error for the judge to refuse to advise the jury of penal consequences, which is the issue in this case. Similarly, although at least one circuit permits instructions informing a jury directly or indirectly of the legal effect of its special verdicts in response to F.R. Civ.P. 49(a) interrogatories, Lowery v.

Clouse, 348 F.2d 252, 261 (8th Cir.1965), none hold that the trial judge is required to do so. Indeed the majority view, including that expressed by this court, is that it is prejudicial error for the court to inform the jury of the effect of its answers. See, e.g., Ratigan v. New York Central Railroad Co., 291 F.2d 548, 554 (2d Cir.1961) (it is "improper ... to submit questions containing the conclusions of law to be drawn from the findings of fact"); Thedorf v. Lipsey, 237 F.2d 190, 193 (7th Cir.1956) (court correctly refused to advise the jury as to the legal effect of a finding of fact); Cate v. Good Bros., Inc., 181 F.2d 146, 149 (3d Cir.1950) (court correctly withheld information concerning legal principles from the jury); Note, Informing the Jury of the Effect of Its Answers to Special Verdict Questions—The Minnesota Experience, 58 Minn.L.Rev. 903, 911 (1974) ("Both federal and state courts have generally adopted the ... view ... that for the court to inform the jury of the effect of its answers is prejudicial error requiring a new trial.") The latter view is favored as insulating the jury, whose duty is solely that of fact-finding, from possible prejudice in the exercise of that function by knowledge of the legal consequences of its findings. For present purposes, however, the important point is that until the present decision no court has ever suggested that a trial court's failure to advise the jury of the effect of its factual answers constitutes reversible error.

It is therefore my view that the majority's holding that it is reversible error not to instruct the jury on the legal consequences of its findings of fact is inconsistent with precedents both in this circuit and in other circuits. Accordingly, I dissent.