Diosdado Z. MATEO, Plaintiff,

and

Benjamin R. Armogenia; Jesus D. Barue-lo; Roy U. Moscaya; Edgardo Bobadil-la; Arthur T. Occenola; Paterno E. Es-carilla; Ismael N. Carino; Guillermo B. Endozo; Luis B. Gurrea; Gerald B. Reyes; Wilfredo C. Domingo; Rene P. Sullesta; Romulo L. Carlos; Junie M. Perez; Antonio V. Bonto; Manuel B. Biloas; Frederick Q. Villareal; Jose Na-chor; and Salvador Ocampa, Plaintiffs–Appellants,

v.

The M/S KISO, In Rem; Vesta Co., Ltd., Defendants–Appellees,

and

Universal Sea Transport, S.A.; Nippon Yu-sen Kaisha Ship Management Co., Ltd.; and Orion Shipping Co., Ltd., Defen-dants.

No. 93–15531.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 12, 1994.

Decided Dec. 1, 1994.

Richard J. Dodson, Dodson & Vidrine, Baton Rouge, LA, for plaintiffs-appellants.

Frederick W. Wentker, Jr., Lillick & Charles, San Francisco, CA, for defendants-appellees.

Before: CHOY, LEAVY, and KLEINFELD, Circuit Judges.

LEAVY, Circuit Judge:

Foreign seamen filed this *in rem* admiralty action against their foreign flag vessel, with *in personam* claims asserted against the vessel's registered and beneficial owners and operators, claiming that the defendants had failed to pay all wages due the seamen. The district court dismissed the personal claims and, following a bench trial, entered judgment in favor of the vessel on the remaining *in rem* causes of action. The seamen have timely appealed. We affirm.

## FACTS [1] AND PRIOR PROCEEDINGS

This case arose out of what was once a widespread system of double-bookkeeping for paying less than first world union wages to third world—mostly Asian—seamen serving aboard flag of convenience merchant ships.[2] After they were sued in federal court, the shipowners paid the seamen the difference between the latter's contracted for wages and the amounts they actually received. The case continued, however, and is now on appeal, because of a dispute over whether certain benefits constitute "wages".

The M/S KISO ("KISO") is a merchant vessel engaged in carrying goods between Japan and the United States. The KISO's owner of registry is Vesta Company, Ltd. ("Vesta"), a Liberian corporation with its principal place of business in Japan. The KISO's beneficial owner is Nippon Yusen Kaisha Ship Management Corporation, Ltd. ("NYK"), a Japanese company. NYK contracted the management of the KISO to another Japanese corporation, Orion Shipping Company, Ltd. ("Orion"). Orion hired the ship's officers and crew, the latter through Universal Sea Transport, S.A. ("Universal"), a Panamanian corporation, which served as

---

1. The underlying facts have been exhaustively detailed in at least two earlier district court decisions, *Mateo v. M/S Kiso*, 805 F.Supp. 761, 766–70 (N.D.Cal.1991), and *Mateo v. M/S Kiso*, 1993 A.M.C. 2278, 2281, 2282–88, 1993 WL 69519 (N.D.Cal.1993).

2. Flag of convenience, or FOC, is a maritime industry term that applies to vessels registered under the flag of a country, and nominally owned by a shell corporation of that nation, other than the country of actual, *i.e.*, beneficial ownership. Because of their unintrusive admiralty law, countries such as Liberia, Panama, and the Republic of Vanuatu have long been favored FOC nations for foreign shipowners. *See Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434, 447 n. 11, 99 S.Ct. 1813, 1821 n. 11, 60 L.Ed.2d 336 (1979).

the KISO's registered manager and operator. Universal in turn contracted directly with Trans–Phil Marine Enterprises ("Trans–Phil"), a Philippine vessel manning agency, for the actual hiring of the vessel's crew.

In the fall of 1989, Trans–Phil provided the KISO with a crew, each member of which belonged to the Association of Marine Officers' and Seamen's Union of the Philippines ("AMOSUP"), an affiliate of the International Transport Workers' Federation ("ITF"). All of the new crewmen signed a number of documents before boarding the KISO, including two contracts. The first contract was a form agreement prescribed by the Philippine Overseas Employment Administration ("POEA"), the government agency responsible for regulating the employment of Filipino seamen on foreign vessels. The second contract was a form agreement prescribed by AMOSUP. The POEA processed these contracts under Philippine law and issued Overseas Employment Certificates ("OECs") to the crewmen. Trans–Phil then provided envelopes marked "Embarkation Orders" to each of the individual crewmen prior to their boarding the KISO. Once aboard, the crew members signed the usual shipboard articles.

The contracts, OECs, and shipboard articles all adopted the terms and international (i.e., first world) union wage rates of the 1989 AMOSUP Collective Bargaining Agreement ("CBA–1"), which was effective from April 8, 1989, until superseded on April 9, 1990, by the 1990 AMOSUP Collective Bargaining Agreement ("CBA–2"). The Embarkation Orders, however, contained terms that differed from those of CBA–1, particularly with respect to the wages to be paid the crew. For instance, while CBA–1 specified a monthly base wage rate of $821 for an able bodied seaman, the Embarkation Orders provided for a base wage rate of only $400.

The system worked as follows: The owners, officers, and managers of the KISO maintained two sets of books. At the end of each pay period, crew members signed two receipts, one true (i.e., for money actually received, as determined by the Embarkation Order monthly base wage rate of $400), and one false (i.e., as calculated by the CBA–1 monthly base wage rate of $821). If, upon entering a foreign port, an ITF representative demanded to see the ship's pay books, he would be shown the false log which recorded CBA–1 pay receipts. Crewmen memorized the union wage scale mandated by CBA–1 and, if interviewed by ITF representatives in a foreign port, were instructed to lie and say that they had received the higher sum.[3]

This practice of double-bookkeeping ended on April 9, 1990, when CBA–2 became effective. After that date, the crew's pay records accurately reflected the amount of money received as wages. Four months later, representatives of Japanese shipowners and of the Japan Seamen's Union, an affiliate of the ITF, began negotiations over wages and the double-bookkeeping system. The parties reached an agreement providing for the payment of the difference between the wages actually given the seamen and the amounts called for under the applicable CBAs. No representative of the KISO crew, and no one from AMOSUP, attended these meetings.

3. As summarized by Professor Herbert Northrup in a separate proceeding, the economic rationale for this system of double bookkeeping was as follows: The ITF, dominated by first world affiliates, attempted to prevent its third world affiliates from underbidding the wages of European and North American seamen by setting pay scales for seamen at first world rates. In an industry dominated by powerful unions, shipowners were understandably reluctant to challenge the ITF directly on this issue. As we recently noted:

The shipowners cannot merely ignore the unions, however, for if the owners fail to pay the union rate, the unions will sometimes interfere with the loading or unloading of the ships. To avoid this, the shipowners must demonstrate compliance with union rules and,

in return, the unions award the ships protection in the form of a "Blue Certificate". By showing a Blue Certificate, ships can forestall union hostility while in port.

*Su v. M/V Southern Aster,* 978 F.2d 462, 465–66 (9th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2331, 124 L.Ed.2d 244 (1993). Instead of having the desired effect of protecting the jobs of first world seamen, however, the ITF's actions simply resulted in Far Eastern shipowners, manning agents, and others using a double bookkeeping sleight of hand when hiring seamen from third world countries. The farce ended for Filipino seamen when AMOSUP bucked the ITF and signed CBA–2, which provided for a base wage rate more nearly in line with the prevailing market rate for able bodied Filipino seamen.

On July 27, 1990, the Japanese shipowners paid the KISO's crew all back wages covering the period from April 9, 1990, when CBA–2 became effective, to July 27, 1990. The following week the crew members also received their back wages covering the period of double-bookkeeping, *i.e.*, from November 1989, when they joined the KISO in the Philippines, through April 8, 1990. (These back wages represented the difference between the amounts paid under the Embarkation Orders and the sums called for under the terms of CBA–1.) The crewmen signed receipts for these sums, acknowledging the amounts received to have been "the outstanding wage differences" paid "in full compliance with and satisfaction of the articles and clauses of" CBA–1 and CBA–2.

Knowing that the KISO was due to arrive in the port of Oakland, an attorney filed an admiralty complaint in the Northern District of California, ostensibly on behalf of three of the KISO's crew members, on August 17, 1990. The complaint asserted both *in rem* and *in personam* causes of action for, *inter alia*, unpaid wages, penalty wages, and attorneys' fees against the KISO, Vesta, NYK, and Universal. Upon docking in Oakland, the defendants posted a $5 million bond in order to avoid having their vessel arrested.

Two days later, an ITF representative and a lawyer boarded the KISO in Oakland and spoke with the crew. Twenty crewmen then left the vessel, including the three named in the complaint, claiming that they had not received an accurate accounting of their back wages from the shipowners. Despite knowing that the KISO was due to sail from Oakland that evening, none of the departing crewmen returned to the vessel, and neither they nor their representative(s) informed the KISO's officers that the crewmen did not intend to return to the ship.

The following day, representatives of the KISO and the disgruntled crewmen met to discuss the situation. After the meeting, the Master of the KISO sent each of the twenty crewmen a letter, stating that he had been dismissed on the ground of desertion. In addition, the letter informed the discharged seamen that they could return to the vessel the next morning and receive their final

wages (i.e., through August 19). Finally, the letter stated that the dismissed crewmen would be flown back to Manila on August 21 at the shipowners' expense. The seamen returned to the KISO the following day, where they were discharged, received their final wages, and signed receipts therefor. At their attorneys' request the crewmen did not fly out of Oakland until August 23, 1990, and did not land in Manila until the 24th.

Upon arriving in Manila, the seamen were supposed to go to the local office of Trans–Phil to pick up the balance of any wages remaining unpaid. (Upon returning from sea duty, Filipino crewmen always went to the Trans–Phil office to receive accrued vacation pay and any wages remaining unpaid. After disbursing the funds, Trans–Phil would notify the shipowners, who would then reimburse Trans–Phil.) None of the returning crewmen went to the Trans–Phil office, however, and neither they nor their representatives informed the defendants or Trans–Phil that they did not intend to pick up their accrued wages.

On December 3, 1990, counsel for the three original plaintiffs filed an amended complaint, adding the names of the other seventeen discharged seamen to the list of plaintiffs, and adding Orion to the list of defendants. The gist of the dispute before the court was whether certain fringe benefits, such as vacation pay and subsistence allowances, constituted "wages" due the discharged seamen. The district court dismissed the *in personam* claims and, following a bench trial in November 1992, ruled in favor of the defendant vessel on the remaining *in rem* claims for unpaid wages and statutory penalty wages. The plaintiffs have timely appealed.

## ANALYSIS

### Payment of Wages

▮▮▮ This appeal stands or falls largely on the determination of whether certain benefits (e.g., vacation) and allowances (e.g., subsistence and travel) constitute "wages" under the provisions of the various contracts as interpreted by the general maritime law. Where the interpretation of contractual

terms requires the review of extrinsic evidence, the district court's findings of fact must be examined for clear error, while its application of legal principles to those facts involves a question of law subject to *de novo* review. *See Tamen v. Alhambra World Investment, Inc. (In re Tamen),* 22 F.3d 199, 203 (9th Cir.1994). In reviewing the district court's decision, we note that "[t]he seafarers bear the burden of showing that the shipowners paid less than the full amount of wages due." *Su v. M/V Southern Aster,* 978 F.2d 462, 468 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2331, 124 L.Ed.2d 244 (1993).

The district court denied the seamen's wage claims on the ground that they had received all compensation to which they were entitled. The plaintiffs (hereafter, "appellants") argue that the district court erred by (1) finding that the appellants' refusal to work after August 19, 1990, justified their discharge and warranted the denial of any compensation for their travel time from Oakland to Manila; and (2) concluding that subsistence allowances were not a form of vacation pay and, therefore, not "wages" to which they were entitled. Each of these issues will be discussed in turn.[4]

### 1. Refusal to Work/Travel Time

■ The appellants argue at length that the district court should have found that the seamen were entitled to compensation for four days' travel time, defined by the appellants to include the three days from their date of discharge (August 20) to their departure from Oakland (August 23), and one day's actual flight time (i.e., from Oakland to Manila on August 24). The appellants cite to no supporting authority, however, for the novel proposition that shipowners must pay wages to seamen who refuse to work aboard[5] their ship, and our research failed to disclose any, either.

Article II, Section 4 of both CBA–1 and CBA–2 expressly provides that any seaman who refuses to work "without justifiable cause ... shall forfeit his right to receive further wages, benefits and privileges ... [and] shall be liable to reimburse the [shipowners] of [sic] any expenses which may be incurred in his repatriation." This provision is in keeping with one of the hoariest maxims of the maritime law, and has been codified under federal law. *See* 46 U.S.C. § 10313(d)(1) ("A seaman is not entitled to wages for a period during which [he] unlawfully failed to work when required").

■ It has long been recognized that, where seamen refuse to work because of a contract dispute, the master has the right to discharge them. 1B Ellen M. Flynn, et al., *Benedict on Admiralty* § 65, at 5–17 (7th ed. 1993) (hereafter, "Benedict"). Thus, "[r]efusal to return to the vessel when ordered will justify discharge of a seaman. The refusal to do duty and to return to the service of the ship is an act of wilful misconduct and a breach of the mariner's contract of employment." 1 Martin J. Norris, *The Law of Seamen* § 21:7, at 611 (4th ed. 1985) (footnote omitted) (hereafter, "Norris").

The appellants contend that, if only they had been given an accounting, they would have returned to work. The district court made no such finding, however. Indeed, the district court expressly found that the claim regarding the lack of an accounting was meritless, and that the refusal to work was unjustified. *See Mateo,* 1993 A.M.C. at 2289, 2292. As the court properly noted:

> Regardless of the reprehensible history shown here, a violation of the law in this case cannot be established by pointing to the previous practice of double-bookkeeping. Plaintiffs have not proven that defendants violated § 10313(g) by failing to pro-

---

4. As a preliminary matter we note that the two sides cannot agree on exactly how many appellants are properly before this court. We agree with the district court's determination that only the fifteen individuals who hired in under the provisions of CBA–1 in November 1989 and were not dismissed on other grounds are properly before us on appeal. *See e.g. Mateo,* 1993 A.M.C. at 2283.

5. The district court did not hold that the disgruntled seamen had committed an act of desertion within the strict meaning of the maritime law; rather, the court held simply that the crewmen had been unjustified in their refusal to return to the ship. *See Mateo,* 1993 A.M.C. at 2288–89. We agree with this finding and conclusion.

vide proper computations of the wages paid and claimed in this case.

*Id.* at 2292.

We agree. Having unjustifiably breached the terms of their contract with their employer, the seamen were properly discharged and were not entitled to any further compensation. Accordingly, the district court did not err by ruling as it did on this issue.

### 2. Subsistence Allowance/Vacation Pay

■ Although the appellants concede that they have received their vacation pay, they contend that they were shortchanged by $17.60 for each day of accrued vacation time because they were entitled to, but did not receive, a subsistence allowance of $17.60 for each day of earned vacation time in addition to their regular vacation pay. The district court rejected this argument, holding that this subsistence allowance did not form part of any vacation wages, but was a "distinctly different subject matter." *Mateo,* 1993 A.M.C. at 2290.

Section 15 of the ITF Collective Agreement ("Agreement") states that "[e]very Seafarer to whom this Agreement applies shall, on the termination of employment for whatever reason, be entitled to 4 days' paid leave for each completed month of service ... plus a subsistence allowance as laid down in Article 21." Section 21 of the Agreement further states that, "Whilst on paid leave a Seafarer shall be entitled to a daily subsistence allowance according to the attached Schedule (Annex 2)." Annex 2 of the Agreement reads simply, "[D]aily subsistence allowance whilst on paid leave—US$ 17.60."

Article IX, Section 1 of both CBA–1 and CBA–2 provides that, "The officers and crewmembers shall be entitled to six (6) days

vacation leave with pay ... for every month of service[.]" No provision is made for subsistence allowances while on paid leave, although Article XII of both CBA–1 and CBA–2 provides for a minimum subsistence of $4.00 per man per day during the course of service. Section 2 of the same article also provides that a seaman is entitled to convert his accrued but unused vacation time into money upon returning to the Philippines. The same right exists under Section 15 of the Agreement.

The district court distinguished the daily subsistence allowance under Section 15 of the Agreement as a benefit different in kind from the vacation pay provided for under the CBAs. *See Mateo,* 1993 A.M.C. at 2289–90.[6] The Agreement provides for four days of vacation per month plus a small subsistence allowance for those four days, while the CBAs provide for 50% more vacation time— all convertible to cash at the end of the seaman's term of service—and a smaller, different calculation of the type of subsistence to be provided crewmen during their terms of service.

Boiled down to its essence, then, the appellants' argument involves an attempt to graft one part of the Agreement they like, *viz.,* the $17.60 daily subsistence allowance, onto a different contract they like much better, *i.e.,* CBA–1, without dragging the Agreement's four-day per month vacation benefit over to the CBAs, which provide for a much more generous six-day per month vacation benefit. Under the circumstances, and in the absence of any controlling authority to the contrary, we conclude that the district court's legal interpretation was correct.[7]

---

**6.** Implicit in the district court's holding is the conclusion that the daily subsistence allowance did not constitute a form of wages within the context of maritime law. This is consistent with Ninth Circuit law. *See Petersen v. Interocean Ships, Inc.,* 823 F.2d 334, 336 (9th Cir.1987) (in establishing a two-prong test for determining whether a maritime benefit constitutes a form of wages, we held that a form of vacation or leave time known as "comp time", calculated at the rate of .35 days for each day of service, was not a form of wages for purposes of 46 U.S.C. § 10313).

**7.** Citing our decision in *Petersen v. Interocean Ships, Inc., supra,* the appellee urges us to set aside that portion of the trial court's decision which holds, or appears to hold, that the vacation benefit provided by CBA–1 and CBA–2 is a wage for purposes of maritime law. In the light of the fact that the appellee failed to appeal from this ruling, and because we affirm without having to "correct" this part of the lower court's ruling, we decline to reach the merits of this issue.

*Penalty Wages/Sufficient Cause*

■ The appellants contend that the defendants' failure to pay all wages due on time and in full warrants the imposition of statutory penalty wages. We review for clear error the factual findings made by a district court sitting in admiralty, while examining *de novo* its conclusions of law. *Havens v. F/T Polar Mist,* 996 F.2d 215, 217 (9th Cir.1993).

We recently summarized the background law relevant to this issue in the following language:

> The Seamen's Wage Act, 46 U.S.C. § 10313, protects seafarers by ensuring they receive timely payment of wages. The Wage Act's full wage provision requires prompt payment of wages at the completion of a voyage:
>
>> At the end of a voyage, the master shall pay each seafarer the balance of wages due the seafarer within 24 hours after the cargo has been discharged or within 4 days after the seafarer is discharged, whichever is earlier.... When payment is not [timely] made ... without sufficient cause, the master or owner shall pay to the seafarer 2 days' wages for each day payment is delayed.
>
> 46 U.S.C. § 10313(f), (g). Necessary to recovery under this provision is a showing that (1) the voyage ended, (2) either the cargo or the seafarer has been discharged, and (3) payment was withheld without sufficient cause.
>
> The Wage Act's half-wage provision also covers partial payments each time a ship stops in port to load or unload cargo:
>
>> After the beginning of the voyage, a seaman is entitled to receive from the master, on demand, one-half of the balance of wages earned and unpaid at each port at which the vessel loads or delivers cargo during the voyage.... If a master [fails to pay], the seaman is released from the agreement and is entitled to payment of all wages earned.
>
> 46 U.S.C. § 10313(e). The seaman must show that the master refused the man's demand for half-wages. Once the master refuses to pay, full wages become due, and if not paid, the seaman may be entitled to

double wages for each day's delay. *In re Williams,* 139 F.2d 262, 263 (4th Cir.1943).

> The Wage Act also has an important jurisdictional provision, extending the Act's protections to seafarers on foreign ships when in a United States harbor:
>
>> This section applies to a seafarer on a foreign vessel when in a harbor of the United States. The courts are available to the seaman for the enforcement of this section.
>
> 46 U.S.C. § 10313(i).

*Su v. M/V Southern Aster,* 978 F.2d at 467–68.

The appellee contends that it had sufficient cause for not tendering to the appellants within twenty-four hours of discharge all of the monies to which the seamen ultimately laid claim. A leading treatise defines sufficient cause as follows:

> The words "refuses or neglects to make payment ... without sufficient cause" connote either conduct which is in some sense arbitrary or wilful, or at least a failure not attributable to impossibility of payment. The phrase "without sufficient cause" must be taken to mean something more than merely valid defenses to a wage claim. Its meaning, in effect, is a wilful, unreasonable and arbitrary attitude upon the part of the master or shipowner in refusing to pay earned wages to the seamen. It may be a high-handed or capricious action, although not necessarily so. "Without sufficient cause" has been characterized by admiralty courts as arbitrary, unwarranted, unjust, and unreasonable conduct.
>
> The presence of good faith or moral justification for refusal to pay undoubtedly has considerable effect in the determination of whether the master or shipowner's action was or was not "without sufficient cause." Generally, where the refusal or failure to pay wages results from an honest difference of opinion arising from a matter in dispute—a dispute about which honest men are apt to differ—the courts will be loathe to declare a penalty when later one of the disputants has been proved wrong.

Norris § 17:5 at 517–19 (footnotes omitted). *Accord* Benedict § 66 at 5–20—5–21.

In determining whether sufficient cause exists,

> [a] showing of good faith upon the part of the master or owner, together with reasonable cause for failure to pay wages due, undoubtedly carries considerable influence in determining whether such refusal is not without sufficient cause. Where the master or owner has acted in a reasonable manner throughout and without any showing of arbitrariness or unjustness, where he had an honest doubt as to the justification of the demand, and where the facts and circumstances surrounding the wage demand are susceptible to an honest doubt as to the justness of the seaman's demand, it cannot be said that the refusal is without sufficient cause.

Norris § 17:6 at 519.

Philippine law precludes Filipino seamen from receiving more than 20% of their wages while at sea or upon discharge, if the discharge occurs in a foreign port. This is because Philippine law requires that at least 80% of a seaman's wages be deposited into a Home Allotment account, *i.e.*, a bank account maintained in the Philippines (as a practical matter, at the local Trans–Phil office) for the benefit of the seaman and/or his dependents.

The appellants received their 20% of accrued wages, both base and overtime, in Oakland within twenty-four hours of discharge. Moreover, it had always been the established practice for discharged seamen to report to their local Trans–Phil office upon returning to the Philippines to collect any remaining wages owing to them, *e.g.*, Home Allotment shares, accrued vacation pay, and any other funds arguably due them, such as travel and subsistence allowances. However, none of the appellants bothered to report to Trans–Phil to collect those amounts due them upon arriving back in the Philippines on August 24, 1990; neither the appellants nor their representative(s) bothered to inform either Trans–Phil or the defendants of the seamen's intention not to report to Trans–Phil; and neither the appellants nor their representative(s) offered any explanation of their reasons for failing to do so until after the defendants instructed counsel for the appellants to have his clients report to Trans–Phil and pick up their money. Finally, the appellants did not assert their dubious—and ultimately rejected—claim to the Agreement's $17.60 per diem subsistence allowance for more than two years, *i.e.*, until the very eve of trial. Despite their vigorous challenge to this per diem subsistence allowance as a part of a seaman's vacation pay,[8] the defendants promptly paid this sum to the appellants within a week of receiving the seamen's demand therefor.

In light of the above, and in the absence of any controlling authority to the contrary, we conclude that the district court did not err by holding that the defendants acted in good faith by abiding with the dictates of Philippine law and long-standing custom in paying off the seamen after they had returned to the Philippines.

## CONCLUSION

The appellants received all the wages to which they were entitled, and any delay in their receipt of payment was excusable on the ground of sufficient cause. Because we find no merit to any of the appellants' remaining arguments, the decision of the district court is

AFFIRMED.[9]

---

8. The appellants do not challenge the appellee's assertion that the Agreement's $17.60 per diem subsistence allowance had never been considered to be a part of the vacation wage due seamen under the CBAs. As already noted the district court expressly found that the Agreement's subsistence allowance was not part of the CBA vacation wage.

9. In light of our holding, we need not and do not discuss the appellants' contention that they are entitled to attorney's fees on remand.