[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15204
_____

D.C. Docket No: 1:09-cv-21814-FAM

ABRAHAM WALLACE,
GLENFORD PALMER,
ADRIAN NASH,
JOHN GEORGE JAMES,
EVEROL BARRANT,
each on their own behalf, and on behalf of all other current
and former employees of Norweigan Cruise Lines Limited similarly situated,
PAULINE HAUGHTON,

Plaintiffs-Appellees,

versus

NCL (BAHAMAS) LTD.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 1, 2013)

Before TJOFLAT and WILSON, Circuit Judges, and PROCTOR,[*] District Judge.

PROCTOR, District Judge:

A passenger's time spent on a cruise ship is typically very relaxing, at least until it is time to disembark.  In this case, the defendant-appellee NCL (Bahamas) Ltd., ("NCL") decided to make that last day of the voyage less stressful for its customers.  To accomplish this goal, NCL implemented a new policy, called "Freestyle" cruising, which permits passengers to stay aboard for a longer time after the ship has docked on the last day of their voyage.  Passengers, who would normally disembark very early, are allowed to stay on board until as late as 10:30 a.m.  That is the good news.

The bad news, at least for the NCL employees who worked as senior stateroom stewards aboard the cruise ships, is that on that same day, while one group of passengers is leisurely disembarking, another group of passengers is eager to board and begin their cruise ship experience.  Due to the arrival of these new passengers, NCL required the senior stateroom stewards to have all of the cabins cleaned by 2:00 p.m. This made it much more difficult for the senior stewards to timely complete their work. That is, although they began their work shifts at 7:00 a.m., for the most part, they were unable to begin cleaning the cabins until as late as 10:30 a.m. because the departing group of passengers was still enjoying their

---

[*] The Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

2

Freestyle cruise. This in turn allowed scant time to complete the assigned cleaning work by 2:00 p.m.  In light of the substantial workload and the shortened time frame within which to complete it, most of the senior stewards adopted the practice of hiring helpers (out of their own pocket) to assist them in completing their work on embarkation day.

This appeal involves the claims of six senior stateroom stewards ("Seafarers") who worked aboard cruise ships operated by NCL.  They assert that NCL has not paid them their full wages because their compensation does not take into account the amounts they were required to pay their helpers to complete their work on embarkation days. Consequently, they contend NCL is liable for compensatory and penalty wages under the Seaman's Wage Act, 46 U.S.C. § 10313, et seq. ("the Act").  The district court awarded them compensatory but not penalty wages. The only substantive issue in this appeal concerns the Seafarers' argument that the district court erred in not awarding them penalty wages.[1]  After careful review, and with the benefit of oral argument, we affirm.

---

[1] In their briefing, the Seafarers argue that they are entitled to post-trial class certification under Federal Rule of Civil Procedure 23.  Although NCL responded to this argument in its brief, we see no reason to substantively address the class certification question.  Consistent with the magistrate judge's recommendation, the district court found that the predominance requirement of Federal Rule of Civil Procedure 23(b)(3) was not satisfied.  The district court noted that in order to pursue their theory of the case, the Seafarers would be required to introduce an overwhelming amount of individualized proof as to two issues: (1) whether and why a particular senior steward hired helpers; and (2) what, if any, damages a particular senior steward suffered.  The district court concluded that the issue of damages in this case is entirely fact specific, and demands a member-by-member analysis. The Seafarers have not addressed, much

## I.  BACKGROUND

### A.    Procedural History

This case originally was filed by thirty-two current and former employees of NCL.  They asserted claims under the Seaman's Wage Act for unpaid wages and penalty wages, and also have advanced a state law claim for breach of the implied contractual covenant of good faith and fair dealing.  Their state law claim involves allegations surrounding their employment and collective bargaining agreements. After amendments to the pleadings and substantial motion practice, the number of plaintiffs and claims was narrowed, and the district court ordered the claims of the Seafarers (*i.e.*, six of the plaintiffs[2]) to be tried first.

The Seafarers' claims were tried in the district court without a jury. On September 7, 2012, the district court entered its Findings of Fact and Conclusions

less contested, these findings in their briefing on appeal.  Moreover, the Seafarers did not press this issue at oral argument.  Finally, we have carefully reviewed the record and find no error in the district court's Rule 23 findings.  For these reasons, and because their class certification argument is wholly without merit, we conclude the district court did not err in denying the motion for class certification.  Therefore, the focus of this opinion is devoted to the penalty wage issue.

[2] Those six plaintiffs are the appellants here and include Abraham Wallace, Adrian Nash, Pauline Haughton, John George James, Glenford Palmer, and Everol Barrant.  The claims of the remaining plaintiffs remain to be tried.

4

of Law. The district court found in favor of the Seafarers on their claims for unpaid wages under 46 U.S.C. §10313(f) and for breach of the implied covenant of good faith and fair dealing. The district court, however, found in favor of NCL, and against the Seafarers, on the claim for penalty wages under 46 U.S.C. §10313(g). After liquidating the amount of prejudgment interest, the district court entered its partial final judgment with respect to the Seafarers' claims on October 1, 2012.[3] This appeal followed.

## B.    The District Court's Findings of Fact

NCL owns and operates a fleet of nine cruise ships. The Seafarers worked on these vessels as senior stateroom stewards during the relevant time period — between May 14, 2006 and June 14, 2009. The Seafarers each signed an employment contract with NCL, under which NCL hired them for ten months. During these ten months, the Seafarers lived on board the cruise ships. They would then take two months of vacation before signing new employment contracts with the same terms and conditions. The Seafarers' employment contracts all incorporated the collective bargaining agreement executed by NCL and the Norwegian Seafarers' Union for Catering Personnel, a labor organization which

---

[3] Abraham Wallace was awarded $14,400.00 in damages plus $5,186.71 in prejudgment interest. Adrian Nash was awarded $14,400.00 in damages plus $4,869.56 in prejudgment interest. Glenford Palmer was awarded $13,650.00 in damages and $4,689.65 in prejudgment interest. Everol Barrant was awarded $9,450.00 in damages plus $2,552.58 in prejudgment interest. Pauline Haughton was awarded $14,700.00 in damages plus $4,949.12 in prejudgment interest. John James was awarded $6,150.00 in damages plus $1,704.34 in prejudgment interest.

represents all of the senior stewards.  The collective bargaining agreement established senior stewards' pay rates and guaranteed that NCL employees would be entitled to one hundred percent of their wages minus approved deductions each month.

On embarkation day (the day a cruise ends, passengers disembark, and new passengers board), senior stewards had to clean between 30 and 35 cabins[4] before new passengers arrived.  On these days, their responsibilities included: (1) stripping the beds of linens and sheets; (2) separating the linens and sheets; (3) making the beds; (4) dusting the cabins; (5) sanitizing the cabin's handrails, door handles, closet doors, frequently touched areas, and telephones; (6) cleaning any used coffee pots and ice buckets; (7) separating the garbage into bottles, cans, paper, and plastic; (8) taking garbage to the incinerator; and (9) vacuuming the cabin and hallways.  NCL had rigorous standards that required "immaculate" cabins and a quality control system to randomly check for cleanliness.

In 2000, NCL implemented its Freestyle cruising policy, which permitted passengers to stay on board later on embarkation day.  This policy was designed to maximize relaxation for passengers.  Prior to this time, NCL required passengers to disembark by 8:00 or 8:30 a.m.  With Freestyle cruising, passengers could stay as long (or almost as long) as they wished.  The senior stewards technically started

---

[4] Although there was some dispute over how many beds 30 to 35 cabins contained, senior stewards had to strip and make at least 70 beds.

their work at 7:00 a.m. on embarkation day, but under the Freestyle cruise system, passengers would leave their cabins much later.  Indeed, few passengers would leave before 8:30 a.m., and most passengers did not disembark until 9:30 or 10:30 a.m.  Because new passengers would venture to their rooms soon after boarding, NCL required that all cabins be cleaned by 2:00 p.m.  This caused problems for NCL senior stewards on embarkation day.  One NCL supervisor noted that with the Freestyle "concept we also advertise relax[ing] debark[ation] which puts another stress" on embarkation day.

Although junior stewards[5] worked alongside the senior stewards, they offered little or no help, and in fact had their own separate work responsibilities. The senior stewards therefore had to complete a substantial workload in a shortened timeframe.  And, if they failed to finish their assignments or rushed their work, they faced a quality control process that could lead to verbal and written reprimands.  Thus, the senior stewards had to hire helpers to complete their duties on embarkation day.

In making the finding that the senior stewards needed to hire helpers to finish their work on embarkation day in a timely manner, the district court

---

[5] Although, technically, the titles NCL uses for the relevant categories of employees aboard its cruise ships are "senior stateroom steward" and "stateroom steward," the trial judge referred to this latter position group, stateroom stewards (who worked alongside the senior stewards) as "junior stewards" and called senior stateroom stewards "senior stewards."  He did so apparently to avoid the confusing use of very similar sounding titles.  For ease of reference and clarity, we use these same designations.

reviewed the testimony of various witnesses and the paper record.  The district

court discredited the testimony of four NCL witnesses who testified that senior

stewards could finish their work without hiring a helper.[6]  The district court found

two NCL witnesses on this issue, Cesar Lanic and Ronald Alcaraz, were credible

and believable.[7]

The district court also commented that at least one voyage note indicates that

the senior stewards complained about the need for helpers on embarkation day.

Further, NCL employees mentioned in various e-mails that the senior stewards

needed to hire helpers.  In one e-mail, a former NCL hotel-operations director

wrote that, because they had not hired helpers the day before, the senior stewards

---

[6] Cesar Hapa, an executive housekeeper at NCL testified that senior stewards could finish their work on time without help.  However, the district court discredited this testimony because Hapa articulated a bias when he blamed nationality for the Seafarers' inability to complete their work.  Michelle Dognon-Bertino, a former NCL hotel-operations director, also testified that the senior stewards could finish their work without helpers.  But, the district court found she lacked credibility because she initially signed a sworn statement in which she said the senior stewards needed helpers to finish their work and made an about-face on nearly everything written in her sworn statement.  Clyde Harbin, a NCL executive housekeeper, testified that he knew the senior stewards opted to hire helpers but despite knowing of the issue regarding helpers did nothing about it.  Patrycja Kosla, a senior NCL housekeeping trainer, testified that she trained junior and senior stewards to work together.  However, the district court did not find her testimony persuasive because of the antagonistic stance she took in response to the questions posed by plaintiffs' trial counsel on cross examination, resulting in illogical responses.  For example, the trial court questioned her testimony that she would voluntarily give up twenty-five percent of her salary.

[7] Lanic and Alcaraz testified that they could clean all cabins without helpers.  However, Lanic and Alcaraz had junior stewards who helped them, and they also admitted they sometimes too hired helpers.  Although the district court found the men to be "outliers" (*i.e.*, their success in completing their assignments was unique as compared to the vast majority of other senior stewards), it did find their testimony believable.

"were a bit negligent with their staterooms." Another e-mail noted that all senior stewards hired helpers except those lucky enough to have helpers assigned to them (and paid for) by NCL.

Based upon these documents and the trial testimony, the district court concluded that it was necessary for senior stewards to hire helpers to complete the work assigned to them on embarkation day.   After making these findings of fact, the district court then explained its conclusions of law.

## C.    The District Court's Conclusions of Law

The district court concluded that the NCL had wrongfully withheld the Seafarers' wages in violation of the Seaman's Wage Act, but did not award penalty wages.  As to compensatory wages, the district court determined that during the relevant claim period, NCL created a situation where it was nearly impossible for the Seafarers to clean all of their assigned cabins without "hiring" helpers. Therefore, the trial court concluded that NCL violated the Seaman's Wage Act by assigning the Seafarers an amount of work that could not be completed without the Seafarers using some of their wages to pay for helpers, and in turn not compensating them in a manner that accounted for the payments they were required to make to their helpers.  Thus, the district court concluded that NCL owed the Seafarers an amount in compensatory damages equal to the money they

9

used to pay helpers to complete the work on time.  According to the district court, NCL's actions, in practice, constituted a withholding of wages under 46 U.S.C. § 10313(f).  This finding is not challenged on appeal.

On the other hand, the district court concluded that a dispute existed about whether the back wages were owed and determined the Seafarers were not entitled to penalty wages under 46 U.S.C. § 10313(g).  The district court provided two reasons for so holding.  First, NCL had a reasonable belief the Seafarers' claimed wages were not due them.  That is, from a technical viewpoint, NCL paid the Seafarers their full wages earned for the hours they themselves actually worked, even though it created a situation that forced the Seafarers to use some of that money to compensate helpers.  Second, at least two senior stewards, Lanic and Alcaraz, told NCL they could complete their work without the aid of helpers because junior stewards helped them do so.  Thus, the district court concluded that NCL had not acted arbitrarily, willfully, or unreasonably, and did not award penalty wages.

## II.  DISCUSSION

As explained above, the primary issue on appeal is whether the district court erred in failing to award the Seafarers penalty wages.  The Seafarers contest the district court's ruling and argue that the district court should have awarded penalty wages because: (1) NCL did not meet its burden to show that the failure to pay was

10

with sufficient cause; (2) the district court's finding that NCL violated the common law duty of good faith and fair dealing necessitates a finding of bad faith withholding of wages; and (3) the district court's other findings of fact demonstrate NCL's conduct was indeed arbitrary, willful, or unreasonable.  For the reasons explained in detail below, we reject each of these arguments.

## A.    Standard of Review[8]

The standard of review that we apply when a party claims a trial court erred in its fact finding is a familiar one.  "We review a district court's factual findings when sitting without a jury in admiralty under the clearly erroneous standard." *Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1228 (11th Cir. 2000).  Federal Rule of Civil Procedure 52(a) dictates that we may review a district court's factual findings only for clear error:

> (1) *In General*.  In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.  . . .

---

[8] The Seafarers maintain the standard of review is *de novo*.  However, a review of their arguments makes clear that in this appeal they actually are contesting the findings of fact made by the district court (and upon which it based its penalty wages ruling).  Thus, we find the operative standard of review is whether the trial court's fact finding is clearly erroneous.  But, even if we reviewed *de novo* the district court's conclusion of law that the Seafarers are not entitled to penalty wages, ("We review [admiralty bench trial] conclusions of law *de novo*."). *See Venus Lines Agency, Inc.*, 234 F.3d 1225, 1228 (11th Cir. 2000).  Based upon an examination of the record, we would affirm.

11

(6) *Setting Aside the Findings*.  Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.

Fed.R.Civ.P. 52(a)(1),(6).  This is a "highly deferential standard of review." *Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1324 (11th Cir. 2008) (citing *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005) and Fed. R. Civ. P. 52(a)).  "A finding of fact is clearly erroneous when the entirety of the evidence leads the reviewing court to a definite and firm conviction that a mistake has been committed."  *Dresdner Bank AG v. M/V Olympia Voyager*, 446 F.3d 1377, 1380 (11th Cir. 2006)(citation omitted); *see also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.  Where there are two permissible views of the evidence, the factfinder's choice between them *cannot* be clearly erroneous.")(emphasis added)(citation omitted).

## B.    Analysis

### 1.    Seaman's Wage Act

Before discussing the merits of this appeal, we begin by reviewing the law applicable to the Seafarers' claims.  The Seaman's Wage Act provides the following regarding payment of wages: "At the end of a voyage, the master shall

12

pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier." 46 U.S.C. § 10313(f). The statute further states that where a shipowner withholds a seafarer's wages and lacks "sufficient cause" for doing so, "the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed." 46 U.S.C. § 10313(g). Under section 10313(f), the seaman is entitled to reimbursement of all wages unlawfully withheld by the shipowner. If the shipowner's withholding is found to be "without sufficient cause," section 10313(g) requires payment of additional penalty wages.

Once the Seafarers established their wages were wrongfully withheld, the burden of proof shifted to NCL to show that the delay in payment was justified (that is, it was not without sufficient cause). *See Arguelles v. U.S. Bulk Carriers, Inc.*, 408 F.2d 1065, 1070 (4th Cir. 1969)("If delay in payment of wages is established the burden of proof is on the ship owner to show that his delay was justified."), *aff'd*, 400 U.S. 351 (1971). "The phrase, 'without sufficient cause,' as used in [§ 10131(g) and its predecessor] means more than the absence of a valid defense to the claim for wages. Otherwise, it adds nothing to the meaning of the statute. In other words, a wrongful withholding alone does not establish the absence of sufficient cause." *See Larkins v. Hudson Waterways Corp.*, 640 F.2d 997, 999 (9th Cir. 1981)(internal citation omitted); *see also Chretien v. Exxon Co.,*

13

*U.S.A.*, 863 F.2d 182, 184 (1st Cir. 1988) (quoting *Larkins*, 640 F.2d at 999)(same); *Henry v. S/S Bermuda Star*, 863 F.2d 1225, 1241 n.70 (5th Cir. 1989) ("We do caution at this juncture that the double wage penalty is not triggered merely by a wrongful withholding."); *Swain v. Isthmian Lines, Inc.*, 360 F.2d 81, 83 n.5 (3d Cir. 1966) ("It is well settled that the mere existence of an unlawful withholding does not, in and of itself, establish the absence of sufficient cause for that withholding.").

Courts have historically characterized a withholding as "without sufficient cause" when premised on willful, unreasonable, or arbitrary conduct.  *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 572, 102 S.Ct. 3245, 3250 (1982) (noting that the purpose of the penalty wages provision is to deter "negligent or arbitrary delays in payment"); *McCrea v. United States*, 294 U.S. 23, 30, 55 S.Ct. 291, 294 (1935) ("The statute thus confers no right to recovery double wages where the delay in payment of wages was not in some sense arbitrary, willful, or unreasonable."); *Mateo v. The M/S Kiso*, 41 F.3d 1283, 1289 (9th Cir. 1994) ("'Without sufficient cause' has been characterized by admiralty courts as arbitrary, unwarranted, unjust, and unreasonable conduct."); *Vinieris v. Byzantine Maritime Corp.*, 731 F.2d 1061, 1063-64 (2d Cir. 1984) (recovery of penalty wages requires there "to be a showing of 'conscious misconduct' on the part of the

14

ship's Captain, . . . which was arbitrary, unwarranted, unreasonable, unjust, and willful")(citation omitted).

> The phrase "without sufficient cause" must be taken to mean something more than merely valid defenses to a wage claim. Its meaning, in effect, is a wil[l]ful, unreasonable and arbitrary attitude upon the part of the master or shipowner in refusing to pay earned wages to the seamen. It may be a high-handed or capricious action, although not necessarily so. "Without sufficient cause" has been characterized by admiralty courts as arbitrary, unwarranted, unjust, and unreasonable conduct.
>
> The presence of good faith or moral justification for refusal to pay undoubtedly has considerable effect in the determination of whether the master['s] or shipowner's action was or was not "without sufficient cause." Generally, where the refusal or failure to pay wages results from an honest difference of opinion arising from a matter in dispute ─ a dispute about which honest men are apt to differ ─ the courts will be loathe to declare a penalty when later one of the disputants has been proved wrong.
>
> . . . [A] showing of good faith upon the part of the master or owner, together with reasonable cause for failure to pay wages due, undoubtedly carries considerable influence in determining whether such refusal is not without sufficient cause. Where the master or owner has acted in a reasonable manner throughout and without any showing of arbitrariness or unjustness, where he had an honest doubt as to the justification of the demand, and where the facts and circumstances surrounding the wage demand are susceptible to an honest doubt as to the justness of the seaman's demand, it cannot be said that the refusal is without sufficient cause.

*Mateo*, 41 F.3d at 1289-90 (quoting 1 Martin J. Norris, *The Law of Seamen* § 17:5, at 517-19, 17:6, at 519 (4th ed. 1985)(citations omitted)); *see also Henry v. S/S Bermuda Star*, 863 F.2d 1225, 1241 n.70 (5th Cir. 1989) ("We do caution at this juncture that the double penalty is not triggered merely by a wrongful

15

withholding.").  Additionally, courts have explained that penalty wages are not recoverable if the shipowner had a reasonable belief that the wages were not due, if the shipowner committed an error in judgment, or if there was a dispute as to the wages owed.  *See Byzantine Maritime Corp.*, 731 F.2d at 1063-64.

Mindful that we must liberally construe the provisions of the Seaman's Wage Act in favor of the Seafarers, *see, e.g.*, *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 782 (1952) ("Whenever congressional legislation in aid of seamen has been considered here since 1872, this Court has emphasized that such legislation is largely remedial and calls for liberal interpretation in favor of the seamen."), after careful review we conclude that the district court's factual findings which formed the basis of its decision not to award penalty wages were not clearly erroneous.

### 2.    The District Court's Findings of Fact Are Not Clearly Erroneous

Initially, we pause to note the precise reasons why the district court concluded that NCL satisfied its burden to show its actions did not demand penalty wages. In part, this is necessary because the Seafarers have incorrectly asserted that the district court's sole ground for denying penalty wages was because two senior stewards, Lanic and Alcaraz, informed NCL that junior stewards helped clean the cabins.  In fact, the district court provided two reasons for concluding that the Seafarers were not entitled to penalty wages.  First, the district court found that NCL had a reasonable belief the wages were not due.  That is, the trial court

16

concluded that in a practical sense NCL had in fact paid the Seafarers the wages they were due for the work they actually performed, even though the company created a situation where they had to use some of that money to compensate helpers.[9]  Notably, the district court observed that (1) the Seafarers' theory of back wage liability, although a winning one, was novel and (2) its own research had not uncovered any opinion (published or unpublished) in which a shipowner was held liable under the Act for failing to compensate seaworkers for amounts paid to others.  Second, the district court found that Lanic and Alcaraz told NCL they could complete their work using junior stewards, who helped clean the cabins. Based upon both of these grounds, the district court found the Seafarers were not entitled to penalty wages.

---

[9] NCL maintains that the Seafarers have waived any argument on appeal related to this first finding on the penalty wage issue because they did not address it in their initial brief. Although they may not have explicitly addressed the trial court's first finding, we find implicit references to it in the Seafarers' initial brief.  For example, the Seafarers cite to evidence that they believe demonstrated that NCL did not have a reasonable belief that the wages were not due. But even if they had not addressed the issue in their initial brief, we do not agree with NCL that the first finding was a separate legal ground upon which the district court based its conclusion not to award penalty wages.  Rather, the district court's conclusion on this issue was based upon a number of factors that formed part of a single analysis.  *See Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1307 (11th Cir. 2012) ("In [*Gray ex. rel Alexander v. Bostic*, 613 F.3d 1041 (11th Cir. 2010)]. . . . [t]he district court…did not state independently adequate alternative grounds for its ruling; it blended a number of factors into its decision. . . .  Here, the district court's decision was not in a single pot with blended ingredients but instead was in a number of pots containing different ingredients.").  In this case, the factors that formed the basis of the court's two specific findings on the penalty wage issue were part of a single judicial determination ─ whether NCL's withholding of wages was "without sufficient cause." Therefore, we find the Seafarers have not waived any challenges as to the trial court's initial finding.

### a.    The Rule 52 Record Evidence Supports the Trial Court's Finding

The Seafarers' contention that NCL presented no credible evidence demonstrating its withholding of wages was with sufficient cause cuts no ice at all. The district court found that NCL presented two credible witnesses at trial on the issue of whether the senior stewards could finish their work without hiring helpers. It bears repeating that one of the grounds upon which the district court concluded the Seafarers were not entitled to penalty wages was the testimony of Lanic and Alcaraz.

Contrary to the Seafarers' arguments, the adverse credibility findings the district court made as to other NCL witnesses are irrelevant to the Rule 52(a) question before us, as that particular testimony did not inform the district court's decision not to award penalty wages. The district court credited the testimony of the two senior stewards who testified that they told NCL they were able to finish their work on embarkation day. Although they may have been "outliers" (and, in fact, were even classified as such by the district court), that designation is simply not determinative. The district court found their testimony believable, and based (at least in part) upon that evidence, the district court found the Seafarers were not entitled to penalty wages. Our role is not to decide that factual issue *de novo*. *See Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 123 (1969). Here, to be sure, there were at least two permissible views of the trial evidence. One

18

such view (which was not adopted by the district court) would have allowed the trier of fact to discredit Lanic and Alcaraz's testimony for one of at least two reasons: (1) because they were outliers; or (2) because other witnesses testified that completing the work without the aid of helpers was impossible. But the point that the Seafarers fail to acknowledge is that the district court took a different, yet equally permissible view of the evidence — that despite their status as outliers, Lanic and Alcaraz were credible witnesses on an important issue of fact. Where, as here, we are presented with two permissible views of this testimony, we cannot say the district court, sitting as a trier of fact, was clearly erroneous in adopting one view over the other. *See Anderson*, 470 U.S. at 574.

### b.   That the Seafarers Prevailed on Their Common Law Duty of Good Faith and Fair Dealing Claim is Inapposite

The Seafarers also argue that because they prevailed on their common law claim for breach of the common law duty of good faith and fair dealing, it follows that NCL acted in bad faith under the Seaman's Wage Act, thus warranting the imposition of penalty wages. The Seafarers' argument is off the mark.

In reaching its conclusion that NCL violated the duty of good faith and fair dealing, the district court explained that under Florida law,[10] a breach of this duty occurs "where one party to a contract uses its discretion to make it difficult for the

---

[10] The record reflects that the parties waived any choice of law issues by agreeing that Florida law applied to all disputes arising under the collective bargaining agreement.

19

other party to fulfill his contractual obligations." The district court noted that the Seafarers' payment to helpers did not constitute an approved deduction under their collective bargaining agreement. The district court also stated that NCL had wide discretion in deciding how much work and how much time was required of the senior stewards on embarkation day, as well as how much help the senior stewards were entitled to receive. Moreover, the district court found that the Seafarers could not have expected that their jobs would require them to pay, out of pocket, helpers to assist in the completion of their work. Thus, the district court concluded that NCL violated its duty of good faith and fair dealing.

The Seafarers contend that this finding necessarily compels the conclusion that NCL acted in bad faith for purposes of the penalty wages provision of the Seaman's Wage Act. However, this is simply not the case. Notably, the district court did not find that NCL acted in "bad faith" in connection with its conclusion that NCL breached its duty of good faith and fair dealing.[11]  Moreover, even if it

---

[11] The Seafarers point to Florida law explaining that the absence of good faith constitutes bad faith. *See Continental Cas. Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312, 1337 (Fla. 2007) ("Conceptually, 'good faith' is generally not applied by itself without resort to the very concept being defined or to its reverse concept of 'bad faith' . . . . Essentially, good faith and bad faith are two sides of the same coin. Put differently, the absence of 'good faith' constitutes 'bad faith,' and qualitative descriptions of 'good faith' conduct are often compared to qualitative descriptions of 'bad faith' conduct composed of terms that are simply the antonyms of terms used to describe 'good faith.'")(citations omitted). This proposition is, at the same time, unremarkable and of no help to the Seafarers here. The authority that the Seafarers' rely upon for the conclusion that the absence of good faith necessarily leads to a finding of bad faith is helpful only in the context of analyzing their common law claims. It is inapposite to the discussion of whether NCL engaged in bad faith in connection with the Seafarers' federal claim for penalty wages.

had concluded NCL acted in bad faith for purposes of this common law claim, bad faith in the penalty wages context is measured against a different legal standard.

To determine whether a delay in payment under the Seaman's Wage Act was reasonable, courts have applied a *subjective* test based upon good faith. *See Bender v. Waterman S.S. Corp.*, 166 F.2d 428, 428 (3rd Cir. 1948) (concluding that the "sufficient cause" referred to in the penalty wages provision need not amount to a valid legal defense to the claim for wages); *Byzantine Maritime Corp.*, 731 F.2d at 1063-64 (noting that the penalty wages provision should not be imposed "where payment is withheld in good faith under a reasonable belief that it is not due, where there is a bona fide dispute as to the amount owed, or where there has been an honest error of judgment in this regard") (citations omitted)). In contrast, under Florida law, in the context of the common law duty of good faith and fair dealing, a finding of "bad faith" is an objective one that does not require a showing of subjective bad faith. *See Vila & Son Landscaping Corp. v. Posen Constr., Inc.*, 99 So. 3d 563, 567 (Fla. Dist. Ct. App. 2012).

Because the legal standards are different, we cannot say the district court erred in failing to award penalty wages on the basis of its finding that NCL violated the common law duty of good faith and fair dealing. Moreover, the district indicated that it appeared a dispute existed over whether the wages were

21

owed.  Indeed, in support of its conclusion regarding penalty wages, the district court noted that NCL had in fact fully paid the wages that the Seafarers claimed for their *own* work — it just created a situation where the Seafarers had to use some of those wages to pay helpers for assistance in timely completing that work.  The district court concluded that a dispute existed over whether the wages were actually due and that NCL had a reasonable belief the wages were properly withheld.  We conclude the district court did not commit clear error in these critical findings, and that these findings support its conclusion that penalty wages were not due, even if NCL breached the state-law duty of good faith and fair dealing.

 

      **c.**     **The Trial Court's Findings of Fact on the Underlying Wage Claims Do Not Undermine Its Fact Finding on the Penalty Wages Question**

Finally, the Seafarers argue that based upon the district court's other findings of fact and the record as a whole, they are entitled to penalty wages.  The extremely deferential standard of review that we must employ and our own examination of the record lead us to the exact opposite conclusion.

The district court made two key findings of fact related to the Seafarers' back wage claims:  that (1) NCL created a situation where it was nearly impossible for the Seafarers to clean their assigned cabins without helpers on embarkation

day; and (2) NCL knew of the need for helpers to be utilized to complete most of the work.  Based upon these findings, the district court found that although it technically paid full wages to the Seafarers for their own actual work performed, NCL was liable to the Seafarers for compensatory damages equal to the amount each paid to hire helpers to finish their work.  However, these findings are of no avail to the Seafarers in connection with their penalty wages claim.  They are simply not evidence of any willful, arbitrary, or willful misconduct on the part of NCL.  Accordingly, we cannot say the district court erred by failing to award penalty wages based upon these findings.

As explained in detail above, the district court made findings of fact which are supported by the record, and upon which it based its decision not to award penalty wages.  That conclusion will not be disturbed based upon other findings that have no bearing on the penalty wages analysis at issue below and on this appeal.

The Seafarers have pointed to the following evidence which they assert entitles them to penalty wages: (1) testimony from an NCL corporate representative that he could not provide a name of a senior steward who could clean his or her cabins on embarkation day without hiring a helper; (2) internal e-mails between NCL management stating that they knew helpers were used to clean cabins; (3) helper audits performed in 2006 to track the hours they helped senior

stewards on embarkation day to determine if those helpers' extra work hours were in violation of International Labour Organization regulations; and (4) a financial analysis performed by NCL to estimate how much it cost the company to pay for the senior stewards' helpers.  However, again, the Seafarers ignore the testimony of Lanic and Alcaraz, which the district court found to be believable,[12] as well as the fact that this evidence was considered by the district court.  We cannot conclude that the evidence necessitated a finding of an arbitrary, willful, or unreasonable withholding of wages, particularly in light of the district court's finding that a good faith dispute existed over whether the wages were actually owed as NCL actually paid the wages but created a situation where the Seafarers

---

[12] Nor can say that the district court clearly erred based upon one executive's testimony that he could not provide the name of a senior steward who completed his or her work without a helper.  Likewise, the audits and financial analysis merely demonstrate what the district court found—that NCL knew a situation existed requiring senior stewards to hire helpers to finish cleaning cabins on embarkation days.  Just as these record facts do not show that the district court clearly erred in its penalty wages findings, neither does the district court's determination that the testimony of Hapa, Dongon-Bertino, Harbin, and Kosla was not credible establish any Rule 52(a) error.  The trial court's findings on issues related to the underlying wage claim simply do not undermine its credibility findings regarding the testimony of Lanic and Alcaraz.  It merely shows that the district court concluded that those four witnesses were not credible in testifying that all of the senior stewards were able to complete their work without hiring a helper.  (Again, the district court necessarily found that the vast majority of the senior stewards were not assisted by junior stewards.).  Moreover, regardless of the district court's findings as to the lack of credibility of Hapa, Dongon-Bertino, Harbin, and Kosla, that did not in any way affect its view of the credibility and believability of Lanic and Alcaraz.  Even in light of the rejected testimony of the other four witnesses, Lanic and Alcaraz's testimony makes "the district court's account of the events . . . plausible" in determining whether NCL acted with sufficient cause.  *See* *Anderson*, 470 U.S. at 573-74.  Therefore, we readily conclude that the district court did not make clearly erroneous findings of fact.

24

had to use some of those wages to hire others to help them complete their embarkation day duties.

The district court weighed the evidence, and found that although it was rare for a senior steward not to use helpers, NCL knew that some senior stewards were able to finish their work on their own or with the assistance of junior stewards. Thus, after reviewing the record and hearing oral argument, we conclude that the district court's findings upon which it based its conclusion not to award penalty wages were not clearly erroneous.

## IV. CONCLUSION

For the reasons set for above, the partial judgment of the district court is **AFFIRMED**.